### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### CHECKER CAB COMPANY and Its Members, Respondents.

No. 16722.

United States Court of Appeals Sixth Circuit.

Oct. 4, 1966.

Certiorari Denied Jan. 9, 1967.

See 87 S.Ct. 715.

Allison Brown, Atty., National Labor Relations Board, Washington, D. C., for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Michael R. Brown, Attys., National Labor Relations Board, Washington, D. C., on the brief.

Louis J. Colombo, Jr., and Philip J. Neudeck, Detroit, Mich., for respondents,

William J. Mullaney, Detroit, Mich., on the brief for Checker Cab Co., Colom-

bo, Colombo, Colombo & Vermeulen, and Frederick Colombo, Detroit, Mich., on the brief for Checker Cab Co. members.

Before O'SULLIVAN and EDWARDS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

EDWARDS, Circuit Judge.

This petition for enforcement of a National Labor Relations Board order presents an unusual set of facts and a unique NLRB order. A union,[1] after an organizing campaign among drivers of Checker Cabs in Detroit, sought and won an NLRB election. The NLRB ordered the election after finding that the appropriate bargaining unit was all of the regular and part time drivers of Checker Cabs in Detroit. The Checker Cab Co. and its member-owners protested the election principally on the ground that the bargaining unit was inappropriate because it required 286 independent employers of taxi drivers to join in joint collective bargaining where previously there had been no history of such bargaining and where they didn't desire to do so.

The Checker Cab Co. and its members refused to bargain following an NLRB certification of the union.

An unfair labor practice complaint was filed. The proceedings on that complaint were based by stipulation on the record made in the representation proceedings. The NLRB, by a divided three to two vote, found respondents guilty of unfair labor practices and ordered them to bargain with the union on the basis indicated. Respondents continued to refuse to bargain, seeking judicial review of the appropriateness of the bargaining unit (see N.L.R.B. v. KVP Sutherland Paper Co., 356 F.2d 671 (C.A.6, 1966) ). The NLRB now seeks enforcement of its order in this court.

Respondents contend that 1) the NLRB had no legal authority to define the "employees" as it did and hence that the bargaining unit which it defined was inappropriate. And 2) if it did have legal authority in these premises, that its order was arbitrary and capricious and (presumably) not based upon substantial facts on consideration of the whole record. 3) As an obviously subsidiary question, respondents claim the NLRB should not have assumed jurisdiction because no single member-owner met the $500,000 volume of business which the Board has determined as its standard for assuming jurisdiction in relation to taxicab companies.

The basic finding on the employer issue contained in the majority opinion of the NLRB is:

"It is thus quite apparent that the members of Checker recognize both the need for, and the benefit from, uniformity of control which Checker alone can exercise over all the drivers, and that the members accordingly share control of their drivers with Checker. Thus we in turn are merely recognizing the pattern established by the parties, without in any way changing the manner in which they have subdivided such control as between the individual cab owner and Checker.[5]

"Under all the circumstances, and particularly in view of the facts that the operation of Checker cabs is represented to the public as one integrated enterprise and that Checker is authorized by its members to exercise a substantial degree of control over the drivers of each of its members for this purpose, *we find Checker and each of its members to be joint employers in a common enterprise—the operation of Checker cabs*—and therefore deem it appropriate to combine the gross revenues of all members for jurisdictional purposes. As these total revenues exceed the retail standard of $500,000 and as legal jurisdiction is present, we find that it will effectuate the policies of the Act to assert juris-

1. Local 10, Transportation Services and Allied Workers, Seafarers International Union of North America, AFL-CIO.

diction herein." (Emphasis supplied; footnote 6 omitted).

5. "Our dissenting colleagues concede that Checker is an 'association of independent owner-operators for their mutual advantage.' The dissent, however, concludes that the mutuality of their interest does not extend to labor relations. In view of the extensive evidence set forth above as to the nature and degree of control exercised by Checker over the employees of its members, we are satisfied that mutuality does exist in this area sufficient for our finding that Checker and its members are engaged in a joint venture. Contrary to the dissent, our decision does not purport to establish a 'multiemployer bargaining association.' Having elected to subject their employees to regulation on a joint basis, the employers within Checker must likewise accept the statutory right of their employees to join together for the purposes of collective bargaining."

The position of respondents and of the minority of the NLRB is effectively set forth by the dissent:

"[O]ur colleagues, in their determination to assert, have taken a hard case and made bad law. Checker and each of its members are found to be joint employers of the employees of such member, even though there is lacking any real employment relationship between Checker and such members' employees. By this hypothesis, there would appear to be as many joint employer relationships as there are members of Checker. The assertion of jurisdiction would then depend on a combination of the commerce facts of an individual member and of Checker. However, no one member and Checker together meet the Board's jurisdictional standards. Here, again, the membership in Checker serves our colleagues' purpose. The fact of such membership is made the basis for a finding that all the members are in relation to one another 'joint employers in a common enterprise.' This legal coinage of our colleagues cannot, however, hide the fact that there is no sound basis whatever for finding that each member is an employer of the employees of every other member. Thus,

by a form of legal hopscotch, the individual members who, in combination are neither a single employer, joint employers, nor a group organized into an established multiemployer unit, find themselves subject to the Board's jurisdiction on a theory which has no basis in fact or law.

"The vice of all this is further demonstrated by the fact that the majority uses the very same approach in finding a unit of all employees driving Checker cabs to be appropriate. Thus, in disregard of long-standing precedent which precludes the establishment of a multiemployer unit in the absence of a multiemployer bargaining history, or agreement as to the appropriateness of such a unit, our colleagues have forced the members of Checker into exactly what they have chosen to avoid, that is, a multiemployer bargaining association.

"In sum, we reject this unwarranted use of the Checker Cab association as an amalgam for joining these independent owner-operators into a pseudo-integrated relationship for purposes of asserting jurisdiction and for unit purposes. This association is no more than an association of independent owner-operators for their mutual advantage; it is not an association for dealing with labor relations. We choose to respect the substance and intent of this mutual arrangement, and we would do so by dismissing the petition." (Footnote omitted)

This is one of those cases where it is easy to agree with either party if only those facts are viewed upon which that party relies.

■ Having the obligation to make an independent review of the whole record (Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)), we present the facts we glean on the dispute here involved, first from the point of view of respondents and then from that of the NLRB. Few if any of these facts are in dispute, but, of course, the parties differ markedly in

their interpretation of the weight and significance to be given them.

### Facts Tending to Establish 286 Independent Taxicab Owner Employers

1. The Checker Cab Company neither owns or operates any cabs nor holds any city or state licenses for same.

2. Each individual owner holds in his name city licenses for the cabs which he owns.

3. Each individual owner holds in his name licenses from the state for each cab in his name.

4. Each individual owner buys and owns title to his own cabs.

5. Each individual owner has final legal authority to hire and fire the drivers of his cabs.

6. Each individual owner hires an agent or agents to collect from and in effect manage his cabs or performs this function himself.

7. Each individual owner files federal income taxes on all of the proceeds from his own cabs.

8. Each individual owner pays social security taxes for drivers who are employed by him on his own cabs.

9. Each individual owner pays withholding taxes for each of the drivers of his own cabs.

10. Each individual owner pays unemployment compensation taxes to the state.

11. No one of the owners has a gross income from the cab business of $500,000 a year.

### Facts Tending to Establish Joint Employer Relationships Between 286 Checker Cab Owners and the Checker Cab Company

1. The Checker Cab Company is a Michigan non-profit corporation which has as members all 286 of the owners of Checker Cabs operating in the Detroit area.

2. Its members operate 900 cabs under the Checker name and employ approximately 7,000 full-time and part-time cab drivers. Together the 286 member-owners gross about $7,000,000 per year.

3. The Checker Cab Company employs approximately 15 people, none of whom are cab drivers. Among the 15 are a personnel manager, an assistant personnel manager, clerical personnel, and "road men."

4. The Checker Cab Company advertises for Checker drivers, requires them to apply at the Checker Cab Company office, where they are interviewed and investigated, and then recommended to individual cabowner employers for employment.

5. Checker Cab Company's "road men" load cabs, order cabs to report to stations to meet trains, or to hotels or meeting places to accommodate public gatherings. They also report infractions of rules by the cab drivers to the supervisors employed by the Checker Cab Company.

6. The Checker Cab Company maintains a central switchboard call system through a single telephone number. Checker also operates public call stations. It also operates a central radio service to dispatch all radio-equipped Checker Cabs. These centralized services operated by the Checker Cab Company account for 20 per cent of all Checker Cab runs during the course of a year.

7. Checker Cab Company also supplies to the owner-members and their drivers a standard driver's manual containing a set of rules for the drivers, a standard information booklet entitled "Things You Should Know," and standard forms for driver leases, for trip sheets and for receipt books.

8. The Checker Cab Company also maintains a board of review composed of senior members which meets every week to consider complaints against the drivers, and which can and does recommend disciplinary measures and discharge of drivers to the owner-employer.

9. Similarly, there is a central insurance board which hears complaints about safety violations against individual Checker Cab drivers.

The recital of these facts leads logically to the assertion that this case is *sui generis*, and that there is no precedent squarely in point.

The National Labor Relations Board cites and relies upon joint employer bargaining orders it approved in Greyhound Corp., 153 N.L.R.B. No. 118 (1965), Spartan Department Stores, 140 N.L.R.B. 608 (1963), and Panther Coal Co., Inc., 128 N.L.R.B. 409 (1960). It also cites Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). This last case did not, however, actually approve a joint employer bargaining order; and the facts in the three NLRB cases referred to were considerably clearer examples of unitary control of allegedly independent operations than we deal with herein.

On the other hand, the precedent argued to us by respondents is just as remote from the crucial decision required here. Respondents cite and rely on Flueling v. Goeringer, 240 Mich. 372, 215 N.W. 294 (1927), a Michigan Supreme Court case where that court held that the Checker Cab Company was not engaged in the cab business but was a service organization for the Checker Cab owner-operators. Respondents also cite and rely upon Hearst Publications, Inc. v. N. L. R. B., 136 F.2d 608 (C.A.9 1943), N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (dissenting opinion), and the subsequent amendments to the National Labor Relations Act contained in the Taft-Hartley Act, 61 Stat. 137–138 (1947), 29 U.S.C. § 152(3) (1964). See N. L. R. B. v. Steinberg, 182 F.2d 850, 854–855 (C.A. 5, 1950); United Ins. Co. of America v. N. L. R. B., 304 F.2d 86, 89 (C.A.7 1962).

It is clear to us, however, that none of these cases or the Taft-Hartley amendments relied upon are close to the central issue here. The Michigan case had no relationship at all to collective bargaining. And the *Hearst* cases and the subsequent Taft-Hartley amendments dealt with the problem of persons alleged to be or found to be independent contractors.

We begin therefore with the statute itself.

The statutory power accorded the NLRB which is currently under consideration is set forth in the National Labor Relations Act in 61 Stat. 137 (1947), 29 U.S.C. § 152(1), (2), (3) (1964); 61 Stat. 143 (1947), 29 U.S.C. § 159(a), (b) (1964):

"§ 152. *Definitions*

"When used in this subchapter—

"(1) The term 'person' includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers.

"(2) The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, * * *.

"(3) The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, * * * *"

"§ 159. *Representatives and elections —Exclusive representatives; employees' adjustment of grievances directly with employer.*

"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: * * *

"(b) Determination of Bargaining Unit by Board

The Board shall decide in each case whether, *in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter,* the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: * * *." (Emphasis supplied).

Early in its history the NLRB asserted its power to enter bargaining orders requiring independent employers to bargain jointly against their expressed wishes. In Waterfront Employers Ass'n of the Pacific Coast, 71 N.L.R.B. 80, 111 (1946), the Board said:

"We conclude, therefore, that this Board is empowered by the Act to find multiple-employer units appropriate for the purposes of collective bargaining, and that we may properly exercise that power under the circumstances in this case. We are not persuaded otherwise by the fact that the companies and employer associations have indicated that they do not desire multiple-employer units. To hold in all cases, especially where the employers have themselves acted on a multiple-employer basis, that the Board is precluded in the face of employer opposition from finding a multiple-employer unit to be appropriate, is to permit the employers to shape the bargaining unit at will, notwithstanding the presence of compelling factors, including their own past conduct, decisively negating the position they have taken. Contrary to the mandate given the Board under the Act, such a holding would in effect vest in the hands of the employers rather than the Board the power to determine the appropriate unit for collective bargaining purposes."

The power of the Board in this field was considered by the Eighth Circuit:

"Obviously all these provisions of the Act place a broad power of discretion, though not one that may be exercised arbitrarily, in the Board for the designation of an appropriate bargaining unit. In National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 572, 82 L.Ed. 831, 115 A.L.R. 307, three related corporations were involved. The two respondents claimed that the third corporation was the 'employer'. There was only one group of employees. The court said, 'Together, respondents act as employers of those employees * * * and together ac-

tively deal with labor relations of those employees.' In Consolidated Edison Co. [of New York] v. [National Labor Relations] Board, supra, [305 U.S. 197, [59 S.Ct. 206, 83 L.Ed. 126] (1938)] the order was directed at more than one legal entity. These entities consisted of the consolidated company and its affiliates, together constituting an integrated system. Each affiliated company was nevertheless a separate entity. It was not suggested in that case either by court or counsel that the fact that the employers were separate corporate entities was a fact affecting the jurisdiction of the Board. The inference to be drawn from these decisions of the Supreme Court and from the language of the statute is that, within the meaning of the Act, whoever as or in the capacity of an employer controls the employer-employee relations in an integrated industry is the employer. So interpreted it can make no difference in determining what constitutes an appropriate unit for collective bargaining whether there be two employers of one group of employees or one employer of two groups of employees. Either situation having been established the question of appropriateness depends upon other factors such as unity of interest, common control, dependent operation, sameness in character of work and unity of labor relations. There may be others; but, unless the finding of the Board is clearly arbitrary upon the point, the court is bound by its finding. In the present instance the conclusion of the Board appears reasonable rather than arbitrary, and its finding is sustained." N. L. R. B. v. Lund, 103 F.2d 815, 819 (C.A.8, 1939).

In *Lund* (as shown above) the Eighth Circuit cited and relied upon the Supreme Court's affirmance of a bargaining order addressed to three related corporations as joint employers. N. L. R. B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831 (1938).

We recognize that these cases are hardly similar to our instant facts, and that the Supreme Court citation is at best *dictum*. But these cases (and those that follow) do illustrate the breadth of discretion which the Board has exercised with occasional express or tacit approval in appropriate bargaining unit proceedings. *Greyhound Corp.*, supra; *Spartan Department Stores*, supra; *Panther Coal Co., Inc.*, supra.

Certainly the statutory definition of the words "person" and "employer" and "employee" in 29 U.S.C. § 152(1), (2), and (3) of the NLRA are very broad. These definitions must be read together with the underlined language of 29 U.S.C. § 159(b), "in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter * * *."

We regard these sections as granting power to the NLRB to hold independent employers who have historically chosen to handle jointly such important aspects of their employer-employee relationship as we have set forth above, to be joint employers for the purpose of defining an appropriate bargaining unit under the NLRA.

In Boire v. Greyhound Corp., supra, the United States Supreme Court, after reciting various facts pointing toward independent employers joint control of certain employees, added this significant sentence:

"[W]hether Greyhound possessed sufficient indicia of control to be an 'employer' is essentially a factual issue * * *." Boire v. Greyhound Corp., supra, 376 U.S. at 481, 84 S.Ct. at 899.

In this case, a group of employers have banded themselves together so as to set up joint machinery for hiring employees, for establishing working rules for employees, for giving operating instructions to employees, for disciplining employees for violation of rules, for disciplining employees for violation of safety regulations. These facts we believe to be "sufficient indicia of control" to warrant the joint employer finding of the Board.

On the whole record of this case as we have reviewed and recited it, we have no doubt that there is substantial evidence to support the factual findings of the Board. Universal Camera Corp. v. N. L. R. B., supra.

The views already expressed indicate, of course, that the Board was within its rules in assuming jurisdiction of this case.

The petition for enforcement is granted.