**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WINDEMULLER ELECTRIC, INC., and Construction Employment Services, Inc., Respondents.**

No. 92–6240.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 3, 1993.

Decided Sept. 14, 1994.

Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Peter Winkler (briefed), Margaret E. Luke (argued and briefed), N.L.R.B., Office of Gen. Counsel, Washington, DC, Stephen M. Glasser, Acting Regional Dir., N.L.R.B., Detroit, MI, for N.L.R.B.

Peter J. Kok (argued and briefed), Elizabeth M. McIntyre (briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for Windemuller Elec., Inc.

Construction Employment Services, Inc., pro se.

Before: NELSON, Circuit Judge; and WELLFORD and GUY,* Senior Circuit Judges.

NELSON, Circuit Judge, delivered the opinion of the court, in which GUY, Senior Circuit Judge, joined. WELLFORD, Senior Circuit Judge (p. 397), delivered a separate opinion concurring in part and dissenting in part.

DAVID A. NELSON, Circuit Judge.

Having determined that the respondents (who were found to be "joint employers") committed certain unfair labor practices, the National Labor Relations Board has applied to us for enforcement of a remedial order. One of the respondents, a minority-owned company that supplies temporary labor to contractors, has failed to appear in the enforcement proceeding. The other respondent, an electrical contractor, vigorously contests several of the Board's findings.

The main issues we must decide are these: (1) whether substantial evidence supports the Board's finding that a humorous reference by one of the electrical contractor's owners to a dramatic influx of employment applications from union members several months earlier had a tendency "to interfere with, restrain, or coerce" the contractor's employees in the exercise of their statutory rights to organize and to join or assist labor unions; (2) whether the Board was justified in concluding that the contractor could not lawfully request the removal of union stickers from company-owned hard hats, notwithstanding that the temporary employees to whom the hats had been issued could and did continue wearing a variety of union insignia on their own clothing; (3) whether substantial evidence supports a finding that three temporary employees were laid off prematurely because of their union activities; and (4) whether there was sufficient evidence for the Board to find, as it did, that a fourth employee was reassigned and that his employment was then effectively terminated because he intended to engage in organizational activity.

* The Honorable Ralph B. Guy, Jr. assumed senior status on September 1, 1994.

We conclude that the first, second and fourth issues must be resolved in favor of the contractor. The third will be resolved in favor of the Board.

I

Respondent Windemuller Electric, Inc., is a non-union electrical contractor based in a suburb of Grand Rapids, Michigan.[1] The company has a branch office in Kalamazoo, some 50 miles away. During 1990, when the unfair labor practices are alleged to have occurred, the company employed between 130 and 150 people and worked on over 300 different jobs. The projects ranged in size from a few hundred dollars to over a million dollars.

To meet fluctuating personnel needs at its various job sites, Windemuller routinely moves people from one job to another, scheduling overtime as necessary. It sometimes borrows employees from other contractors on a short-term basis, and in 1989 it started to make occasional use of temporary employees carried on the payroll of respondent Construction Employment Services, Inc. ("CES").

CES, according to testimony introduced at a hearing before an administrative law judge, was founded in May of 1989 by an African–American entrepreneur named Roosevelt Tillman. Mr. Tillman ran CES with the assistance of one other employee. The firm supplied contractors with temporary help in a variety of trades, ranging alphabetically from block masons and bricklayers to sprinkler fitters and welders.

Mr. Tillman, who represented CES at the hearing without the assistance of counsel, was called as a witness by Windemuller. Tillman testified that the first temporary employees furnished to Windemuller by CES were two apprentices whom he sent to Windemuller's vice president and part owner, Mike Windemuller, in September or October of 1989. The apprentices worked for Windemuller "[a] [c]ouple of weeks."

During 1989, according to Mike Windemuller's testimony, Windemuller Electric received over 100 direct applications for employment. Of that number, 26 employment applications were received on a single day—

October 18, 1989—when several car loads of International Brotherhood of Electrical Workers members drove to Windemuller's Grand Rapids office and presented applications on behalf of themselves and other members of the union. Among the applicants were the presidents of IBEW Local Unions 131 and 275, various other union officers, and two full-time paid union employees.

Many of the applications were accompanied by form letters from the IBEW advising Windemuller that "[s]hould you fail or refuse to fairly and nondiscriminatorily consider this applicant for employment ... we reserve the right to bring such failure or refusal to the attention of the National Labor Relations Board as violations of Section 8(a)(1) and (3) of the Act." Windemuller processed the employment applications in the normal manner, but none of the applicants was hired.

The unions subsequently filed unfair labor practice charges with the NLRB, alleging that Windemuller had refused to hire the applicants because they belonged to a union. These charges were ultimately picked up by the NLRB's general counsel in a complaint that triggered the administrative proceeding now under review. The administrative law judge who heard the case found other allegations in the complaint to be meritorious, but not these; the ALJ concluded that the general counsel "failed to prove that the Company discriminatorily refused to hire or consider the union applicants for employment...."

On January 17, 1990—a full three months after the mass submission of employment applications by the IBEW in Grand Rapids—Windemuller held a breakfast meeting at a Kalamazoo restaurant for those of its employees who worked in the Kalamazoo area. (The meeting—one of a series of monthly breakfast sessions—provided an opportunity for management officials and others to update everyone on current and future projects in the area.) Mike Windemuller gave a talk in which he indicated that staffing on the company's jobs was growing tight, so the company was looking for people to hire.

---

1. Windemuller has operated on an open-shop basis since 1970, when a union that had represented the company's electrical workers for several years was decertified following an NLRB-supervised election. A different union lost a representation election in 1978, and there has been no election since that time.

Someone asked if there were any applications on file. Mr. Windemuller's response—which evoked laughter from the audience—was "yeah, [we've] had a lot of applications from the union." (Mr. Windemuller was referring, obviously, to the preceding October's flood of applications in Grand Rapids.) When the laughter subsided he added that he had checked with other contractors in the Grand Rapids area, and they too had received a lot of applications from the union. At the conclusion of Mr. Windemuller's talk, the Kalamazoo branch manager for Windemuller, Bill DeDoes, said that anyone who knew of any journeyman electricians in the Kalamazoo area should have them get hold of DeDoes, because more electricians would be needed.

It is the theory of the Board's general counsel that Mr. Windemuller's wry allusion to the union's October surprise in Grand Rapids constituted an unfair labor practice; in the general counsel's view it tended to coerce Kalamazoo-area employees by telling them, in effect, that Windemuller would not consider union applicants for employment. The record nonetheless indicates that Windemuller had repeatedly hired known union members in the past and was to do so again as early as January 23, 1990, six days after the breakfast meeting, at which time the company recalled an IBEW member named Eugene Roberts. (On January 22, 1990, the company recalled a black employee, Michael Hudnell, and a week later it hired a female applicant, Brenda Jackson, who started as an apprentice and is now a journeyman electrician.)

Windemuller wanted to increase the number of African–Americans and members of other racial minorities in its employ, and early in May of 1990 Mike Windemuller and a company superintendent named Kirk Strong had a luncheon meeting with Roosevelt Tillman, of CES, to discuss possible ways of achieving this goal. In addition to talking about how Windemuller might improve its minority recruitment effort, Mr. Tillman made a sales pitch for CES. He then invited the men from Windemuller to accompany him to his office after lunch to examine employment applications on file from electricians who were seeking temporary jobs.

The invitation was accepted, and Messrs. Windemuller and Strong proceeded to review the qualifications of 20 to 30 applicants. Windemuller "pre-approved" approximately 10 applicants as acceptable candidates. At the hearing before the ALJ Mike Windemuller identified four of the people thus pre-approved as individuals whose work histories, which were set forth on their applications, showed that they were IBEW members or had union backgrounds. The union label did not deter Windemuller from pronouncing the applicants acceptable.

Mr. Tillman testified that Kirk Strong telephoned him on May 11, 1990, soon after their luncheon meeting, with a request for several electricians in the journeyman and apprentice categories. Strong told him, according to Tillman, that he would need the people for one to two weeks. Mr. Tillman promptly called the applicants who had been pre-approved—taking it upon himself to tell them, based on past experience with construction work, that he thought the job would last approximately four weeks—and on the following Monday morning, May 14, 1990, five CES temporary employees reported for work at a job site where Windemuller was installing power and lighting items in two levels of a building being constructed in Kalamazoo for the Upjohn Company. Several electricians temporarily borrowed by Windemuller from other Kalamazoo-area contractors had already been put to work on this job, according to Mr. Windemuller's testimony, starting as early as late April or the beginning of May.

The general contractor on the Upjohn project required its subcontractors to have their employees wear hard hats of designated colors. Each subcontractor was assigned a different color so that its people could be readily identified. Windemuller's assigned color was yellow. When the five temporary employees from CES reported for duty on May 14, each of them was issued a yellow hard hat owned by Windemuller and bearing Windemuller's name. They were also issued safety booklets containing decals with emergency telephone numbers. After reading the safety booklets, the men were instructed to affix the decals to the backs of their hard hats.

When the five CES people came to work the following day, their supervisor observed

that four of them had decorated their company-owned hard hats with stickers or decals bearing union messages. The four men were also displaying union buttons and union emblems on their clothing, which included union jackets and union T-shirts.

The first witness called by the general counsel at the hearing—Barry Alan, a "salt" surreptitiously placed with Windemuller by an IBEW local union—testified that Dick Thompson, a Windemuller superintendent, "became outraged" after seeing the union items on Windemuller's hard hats. Superintendent Thompson told two other management people and Mr. Alan (whom Thompson had promoted to a foreman's position) that "he [Thompson] didn't think that those union people should be wearing union buttons and stickers on Windemuller's hard hats because Windemuller wasn't a union contractor and they should take those stickers off."

Nothing was said to the CES employees at the time, but the following day Mr. Thompson asked them to remove all stickers from the hard hats except for the Windemuller name and the decals with the emergency telephone numbers. As one of the CES people testified, "Dick Thompson asked us if we would remove the stickers from their [Windemuller's] hard hats since it was their property and they didn't want the IBEW stickers on their hard hats."

Mike Windemuller testified that Mr. Thompson had talked to him about the union paraphernalia, and Windemuller had told Thompson to ignore everything but the items on the company's hard hats and to ask the men to remove the unauthorized stickers from the hats. (Mr. Windemuller cited both marketing and safety reasons for not wanting additional stickers on the company's hats.) The CES men complied with Mr. Thompson's request, and they returned to work after taking the union stickers off the hats.

At some point during the week of May 14, according to the uncontradicted testimony of Mike Windemuller and Bill DeDoes, the Austin Company (Upjohn's general contractor) called a halt to work on a power riser contract under which Windemuller was installing feeder conduits between the basement and the penthouse of the building. Austin decided that it wanted to install some heavy equipment on the upper floors before the power riser work continued. This decision meant that three Windemuller electricians who had been working on the riser project would be freed for other work. Windemuller assigned these employees to the ongoing project in the lower levels of the building, where they were to start work on Monday morning, May 21.

About mid-day on Thursday, May 17, superintendent Dick Thompson called foreman (and union "salt") Barry Alan and told him that he would be laying off Messrs. Sosnowski, Tishhouse and Ketchum—three of the CES temporaries—the following day. Mr. Alan responded, according to his testimony, that superintendent Strong had previously told him that workers borrowed from other contractors would be laid off first because their rate of pay was higher. Mr. Thompson then said, according to Alan, that he had just come from a meeting with Bill DeDoes, and the instructions were "to lay off the three union people first." When Alan pointed out that there were four union people among the CES employees, Thompson responded that they were going to keep Mike Stackpole—an apprentice—because he did not cost the company as much as the journeymen.

Upon finishing work on Friday, May 18, Messrs. Sosnowski, Tishhouse and Ketchum went to the CES office, turned in their timecards, and told Roosevelt Tillman that they had been laid off and were available for other work. Mr. Tillman—who expressed surprise at seeing them back so soon—subsequently offered other work to each of the men, or attempted to do so.

The hearing record indicates that the three Windemuller employees who had previously been assigned to the riser project started work on the lower level job—the project to which all five CES employees had been assigned until May 18—on Monday, May 21. Barry Alan testified that of the workers on the lower level project who had been borrowed from a contractor identified as Allied Electric Company, one quit during the week of May 21 and the rest were sent back to Allied at the end of the week.

The final episode in question here involves an electrician named Bill Quick. Mr. Quick worked at Kemp Electric, a unionized contractor, from June 4 to July 28, 1990. Having been laid off from that job at the end of July, he testified, he went to the CES office on August 6, a Monday, and filled out an employment application.

Mr. Quick spoke briefly with Roosevelt Tillman on this occasion, telling Tillman about his work experience and licensure. Quick held a Michigan master electrician's license, and he showed the license to Tillman. The license listed Quick's employer as "Bill's Electrical Service." Quick had worked as an electrical contractor in several states, and he told Tillman, according to the latter's testimony, that he had built homes from the ground up in Florida. Mr. Tillman testified that he had understood that Mr. Quick possessed a Michigan electrical contractor's license—presumably for "Bill's Electric Service"—but Quick testified that his master electrician's license merely made him eligible to obtain a contractor's license upon payment of a fee; he did not possess a Michigan contractor's license on August 6.

Tillman hired Quick and sent him to work at Windemuller, which needed a journeyman electrician. (A contemporaneously-prepared CES record indicated that Windemuller needed someone for a period of one to two weeks. Quick testified, however, that Tillman told him the job should last into early October.)

Mr. Quick presented himself for work at the Upjohn site early Tuesday morning, August 7. While visiting with Windemuller personnel before the starting whistle blew, he volunteered the information that he had been employed at Kemp Electric. Fred Syswerda, who had replaced Barry Alan as foreman[2] and whose own application for employment at Windemuller indicated a union background, asked Quick if he belonged to the union. Quick replied that he was not a union member.

After Mr. Quick's second day of work for Windemuller, Roosevelt Tillman placed a telephone call to Quick and, according to Tillman, left a message on the answering machine of the house where Quick was temporarily living. (Quick testified that he "could have" received the message, but did not remember having done so.) The message, Tillman testified, was that Quick should report back to the CES office on Friday for reassignment.[3]

The reason for the reassignment, Tillman testified, was that his mother, Virginia Tillman, was in the process of remodeling the apartment building in which she lived; Mr. Tillman had inspected the work on Tuesday, August 7, according to his affidavit, and determined that it was time for the electrical part of the job to be performed. Mrs. Tillman wanted to convert the electric service for two apartments into a single unit. Only a licensed electrical contractor could do this, and Mr. Quick possessed both the experience for such a job and, as Mr. Tillman understood it, the necessary license. It was Tillman's plan to have Quick do the work.

Mr. Quick's testimony indicates that Tillman stopped at the Upjohn site on Thursday, August 9, and dropped off a timecard and handbook for Mr. Quick. Tillman did not see Quick personally on Thursday, but left word, as Quick got the message, that he would be calling him the next day.

Although Mr. Quick was not a union member at this time, he had been keeping in

**2.** IBEW Local 131, which since August of 1989 had been paying Mr. Alan under the table to act as its "salt," called Alan off the job as of August 3, 1990. There is no contention that Windemuller let Alan go because of his union activities. Indeed, notwithstanding notification from the union on June 1 that Alan would represent it for purposes of organizing, Windemuller gave Alan a merit pay increase in July. Alan himself testified that Windemuller was a good employer, in his judgment, and he thought the company treated him fairly.

**3.** The timing of this call, as we shall see, is a matter of some importance. It was established through a CES long distance telephone bill that Mr. Tillman placed the call at 7:10 p.m. on Wednesday, August 8, 1990. The content of the message is also important. Mr. Tillman repeatedly testified that his message was that Mr. Quick should report on Friday "for reassignment," but those words were omitted from a prehearing affidavit that a representative of the NLRB prepared for Mr. Tillman's signature after interviewing him.

touch with IBEW Local 445, in Battle Creek, about the possibility of getting union work if any came up. He checked in at the union hall after his first day at Windemuller, and was asked at that time if he would be interested in acting as a "salt." Quick agreed to do so, and was given a union organizing pin to start wearing at a later time.

Mr. Quick first wore the union pin at work on Thursday morning, August 9. Foreman Fred Syswerda spoke with him that morning, but said nothing about the pin. Sometime during the day on Thursday Windemuller received a letter from Local 445 stating that Mr. Quick was engaged in organizing activities and was protected by the National Labor Relations Act.

Fred Syswerda saw Mr. Quick again on Friday morning, August 10, and said that he was disappointed in him for lying about his union affiliation. Mr. Quick explained that he was not in fact a union member, but Syswerda said he was still disappointed. (The ALJ subsequently found that Mr. Syswerda, a "lead man" like Barry Alan, was not acting as a supervisor or agent of the company; an allegation by the NLRB general counsel that the company had engaged in unlawful interrogation through Syswerda was dismissed.)

Mr. Quick had previously mentioned to Syswerda that he planned to leave work at noon on Friday in order to drive to Tennessee for the weekend. He asked Syswerda at lunchtime if this would still be all right, and Syswerda said it would.

Quick called Roosevelt Tillman at noontime on Friday, before leaving for Tennessee, and Tillman asked him to report to the CES office on Monday morning, August 13, because he had some other work for Quick to do. Quick promptly advised his foreman, Fred Syswerda, that he would not be at work on Monday because he was being transferred to another job, and as instructed, Quick presented himself at CES on the morning of the 13th.

Tillman, in the meantime, hired a journeyman electrician named Darwin Patterson [4] and directed Patterson to report at Windemuller's Upjohn building job site on the same Monday morning, August 13. Patterson did so, he testified, and worked there as Quick's replacement until August 31, the Friday before Labor Day.

Tillman told Quick at their meeting on the morning of the 13th that the work he wanted him to do was at Tillman's mother's place. The two men then walked through the job so that Tillman could explain what he wanted done. Quick, who had driven all night getting back from Tennessee, asked Tillman if it would be all right for him to start the job Tuesday morning. Tillman evidently agreed. Quick worked at Tillman's mother's residence both Tuesday and Wednesday, August 14 and 15, repairing circuits and installing new lighting fixtures.

On Thursday the 16th, as directed by Tillman, Quick started pricing and buying materials for the electrical service change. On Friday the 17th Quick gave Tillman receipts for his purchases and reported that he would have to drive to Lansing that day to update his contractor's license in order to get a permit for the service change. Tillman said he thought that Quick already had the license, but Quick told him that it had expired and needed to be revalidated.

On Monday morning, August 20, Quick presented himself at the CES office, as usual, and handed Tillman his timecard for the previous week. Tillman objected to paying for the hours Quick had charged on Thursday and Friday, and a disagreement arose as to what the hourly rate should be. Tillman said he could afford to pay only one dollar an hour more than Quick had been receiving as a journeyman on the Windemuller project, and Quick wanted more than that for working as a contractor. Quick became upset, according to Tillman, walked out the door, and never showed up again. As far as Tillman was concerned, this was a "voluntary

---

**4.** After Tillman had told Patterson he was hired, and while Patterson was filling out his tax forms, according to the latter's testimony, Tillman asked Patterson if he were a union man. Patterson responded that he was not. Tillman then told

him—still according to Patterson—"that I could lie about it, but that usually he can tell by talking to someone whether they're being truthful or not."

quit." Mr. Tillman testified, without contradiction, that Windemuller never asked him to remove Quick from its job site. Mike Windemuller testified to the same effect.

On August 14, 1990, IBEW Local Union 107 filed unfair labor practice charges against both CES and Windemuller for removing Mr. Quick from the Upjohn job and replacing him with another electrician. On August 22, 1990, the union filed an amended charge against CES, asserting that on August 20 CES had constructively discharged Quick for union activities.

## II

In an amended complaint issued through a regional director of the NLRB on December 27, 1990, the Board's general counsel alleged, among other things, that Windemuller and CES were joint employers. The complaint went on to allege that Windemuller had violated the National Labor Relations Act (1) by refusing to hire or consider for employment some 29 named individuals, most of whom were union people who had applied for employment in Grand Rapids on October 18, 1989; (2) by impliedly stating to employees on January 17, 1990, that it would not consider union electrician applicants for employment; (3) by prohibiting its employees from wearing union stickers on their hard hats on May 16, 1990; (4) by causing CES to lay off Tom Sosnowski, Steve Tishhouse and Larry Ketchum on May 18, 1990; and (5) by coercively interrogating employees on August 7, 1990, through its agent Fred Syswerda, regarding their union membership, activities, and sympathies. The complaint further alleged that CES had violated the National Labor Relations Act (1) by coercively interrogating employees on August 10 and September 20, 1990,[5] through its agent Roosevelt Tillman, regarding their union membership, activities, and sympathies, and (2) by refusing to hire or recall or consider for employ-

ment Tom Sosnowski and another individual, beginning September 21, 1990. Finally, the complaint alleged that Windemuller and CES had both violated the National Labor Relations Act on August 10, 1990, by causing employee William Quick to be removed from the Upjohn site.

The matter came on for hearing before the administrative law judge on February 11, 1991, and the hearing was concluded 10 days later. (The hearing transcript is 777 pages long; the transcript and accompanying pleadings and exhibits form a stack of paper seven inches high, not counting the briefs that each party filed.) In due course the ALJ issued a decision and order containing detailed findings of fact and conclusions of law. The decision and order take up 33 single-spaced pages.

Windemuller took exception to portions of the ALJ's decision and filed a brief with the NLRB in support of its exceptions. On March 9, 1992, a three-member panel of the Board issued a very brief decision and order correcting one erroneous date in the ALJ's decision and otherwise affirming the decision and order without change.

On September 29, 1992, the NLRB applied to this court for enforcement of its order. We have had the benefit of comprehensive briefs and oral argument by Windemuller and the Board,[6] and the matter is ripe (if not overripe) for decision. Our principal task is to canvass the entire record and determine, in light of the record as a whole, whether the Board's decision is supported by substantial evidence. See *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Supreme Court has charged us, in performing this task, "not to abdicate the conventional judicial function." *Id.* at 466, 71 S.Ct. at 490. Further, the Court has said,

---

**5.** The September 20 incident involved a journeyman electrician named Keith Wolfsen who applied at CES on that date. Mr. Tillman looked over Wolfsen's employment application, which had no entries under a section that called for a listing of "current professional affiliations and organizations," and asked Wolfsen if he belonged to any associations. Wolfsen replied that he

belonged to the RESCS, a society for refrigeration engineers. Tillman asked no further questions.

**6.** CES, as noted at the outset of this opinion, did not enter an appearance and has not participated in the enforcement proceeding.

"The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Id.* We bear these admonitions in mind as we turn, at last, to our analysis of the issues.

## III

A. *Mike Windemuller's Humorous Reference to the 26 Employment Applications Submitted in Grand Rapids on October 18, 1989.*

Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [of the Act]." Among those rights are "the right to self-organization [and the right] to form, join, or assist labor organizations...." 29 U.S.C. § 157.

■ The Act does not and cannot repeal the First Amendment of the United States Constitution, with its prohibition against laws abridging freedom of speech. The sensitivity of Congress to this fact is reflected in § 8(c) of the Act, 29 U.S.C. § 158(c). That section provides that "[t]he expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit."

■ It is a serious business for the government to censor the speech of its citizens. Employer speech that truly does "interfere with, restrain, or coerce employees" in the exercise of their collective bargaining rights can undoubtedly be abridged by the government—just as, in Justice Holmes' memorable conceit, the right to shout "fire" in a crowded theater can be abridged—but constitutional considerations suggest that we should be vigilant to see that the NLRB does not read elements of interference, restraint or coercion into speech that is in fact nonthreatening and that would not strike a reasonable person as threatening.

■ When Mike Windemuller told the Kalamazoo-area employees, in response to the question asked during the breakfast meeting of January 17, 1990, that the company had a lot of employment applications from the union, he was undoubtedly referring, as the ALJ expressly found, to the large number of applications submitted at Grand Rapids on October 18 of the previous year. Windemuller undoubtedly regarded those applicants as being "from the union," and the ALJ found this as a fact too.

It would be fair to assume, moreover, that if it were up to him, Windemuller would probably have preferred not to be unionized. His audience probably knew this (and he probably knew that they knew it), which is probably why the audience broke into laughter. Windemuller's rueful reference to the sudden flood of union applications may not have been politically correct—there is not much laughter, one supposes, where political correctness holds sway—but his one-liner does seem to have had the virtue of being funny. It got a laugh. And there is no suggestion in the record that the little jest made by Mr. Windemuller in response to the question from the audience was anything other than spontaneous, unplanned, and unrehearsed.

It is true that threatening statements can sometimes be made in humorous terms. See *NLRB v. Homemaker Shops, Inc.,* 724 F.2d 535, 550 (6th Cir.1984). Usually, however, they are not—and people who are being threatened do not usually find it amusing. If there was an unspoken threat in what Mr. Windemuller said, its presence is far from self-evident.

It is one thing for an employer to acknowledge, in a humorous way, that he has been the target of unusual attention from a union, but it is quite another thing for the employer to threaten to break the law in response. The ALJ concluded that the "plain implication" of what Windemuller said was that "the Company would not consider for employment those applicants whose manner of application indicated that they were likely to engage in union organizational activity." Viewing the

record as a whole, we can discern no such implication.

Mr. Windemuller knew perfectly well that it would be illegal for him to discriminate against union activists—the union had told him so, for one thing, in the form letters accompanying the applications—and after an exhaustive review of the record, the ALJ found no proof that the union applicants had in fact been discriminated against. Windemuller Electric had already been through two representation elections, moreover, and Mike Windemuller obviously knew the rules of the game. Perhaps he did not like the rules, but that hardly means that he was publicly threatening to break them.

The ALJ relied heavily on the fact that after Mr. Windemuller had finished, Kalamazoo Branch Manager Bill DeDoes stood up and asked that anyone knowing of journeymen electricians in the Kalamazoo area refer them to DeDoes. This may well have indicated that the union people who had applied in Grand Rapids three months earlier were not going to be hired now to work in Kalamazoo, but no sinister inference can fairly be drawn from that fact. The two cities are 50 miles apart, and by industry standards the applications were hoary with age. Although applications were sometimes kept on file for more than 30 days, the ALJ found in a different context that "it is unlikely that DeDoes or Windemuller would seriously consider applications over three months old, where the applicants had not contacted the Company since filing." The union applications to which Mr. Windemuller referred had obviously grown stale by the time of the breakfast meeting in Kalamazoo, and the record contains no indication that there was anyone in the room who did not know this.

Neither is there any indication in the record that Mr. Windemuller's response to the question about pending applications was calculated to create an "atmosphere," as we called it in *Indiana Cal–Pro, Inc. v. NLRB*, 863 F.2d 1292, 1300 (6th Cir.1988), wherein company employees would feel coerced, restrained or otherwise interfered with in the exercise of their right to organize under union auspices. In the *Indiana Cal–Pro* case there were two employees who gave direct testimony about the creation of a threatening or intimidating atmosphere. *Id.* at 1299–1300. In the case at bar, by contrast, there was no such testimony at all.

The silence of the record is significant. Barry Alan, the union "salt," would have been in an ideal position to know if management people were issuing veiled threats—and nothing in his testimony remotely suggests that they were doing so. On the contrary, Mr. Alan explicitly testified that Mr. Windemuller never indicated in the January meeting that he would not hire IBEW members and never said that he would not consider IBEW applications. Not a single person in the Kalamazoo-area work force testified to the contrary. Viewing the record as a whole, we are satisfied that it contains no substantial evidence to support the conclusion that anything said at the breakfast meeting on January 17, 1990, violated § 8(a)(1) of the National Labor Relations Act.

B. *Windemuller's Unwillingness to Let Union Stickers Be Displayed on Company–Owned Hard Hats.*

■ With regard to the company's decision to ask that union stickers be removed from company-owned hard hats, the ALJ found as a fact that "Windemuller wanted the stickers removed because the Company was a nonunion firm, and therefore [Windemuller Superintendent Dick Thompson] did not want any union identification on the hardhats, which he regarded as Company property." During the hearing the ALJ observed, at page 277 of the hearing transcript, that "it's obvious that we know exactly what happened." The only question presented, in the ALJ's view, was "a question of law, basically." We agree with this characterization of the question, if not with the answer the ALJ gave to it.

Citing *Malta Constr. Co.*, 276 NLRB 1494 (1985), *enf'd, NLRB v. Malta Constr. Co.*, 806 F.2d 1009 (11th Cir.1986), the ALJ found that "the Company violated Section 8(a)(1) by prohibiting its employees from wearing union stickers on their hardhats." If the company had not permitted the men to wear union emblems on their clothing and other items owned by them—union jackets, union T-

shirts, union pencil holders, and union buttons, all of which remained on display after the stickers were removed from the hard hats—we assume that the finding of a violation would have been justified. See *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). But there is no dispute as to the fact that Windemuller scrupulously honored the presumptive right of the employees to wear union insignia on their own clothing, just as there is no dispute as to why it was that Superintendent Dick Thompson "regarded [the hard hats] as Company property." He regarded the hats as company property because that is what they were. The employees themselves acknowledged in their testimony that the hard hats belonged to the company, and the record makes it absolutely clear whose hats they were. Under these circumstances, it seems to us, the ALJ and the Board answered the legal question incorrectly. It was not an unfair labor practice for the company to ask that hard hats owned by it not be used as billboards for the union, as long as employee-owned jackets, T-shirts and the like could be used for that purpose.

■■■■ In a line of United States Supreme Court decisions culminating in *Lechmere, Inc. v. NLRB,* 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992), the Court "has drawn a very clear line beyond which the organizational rights of the union may not take precedence over the property rights of the employer." *Oakwood Hospital v. NLRB,* 983 F.2d 698, 701 (6th Cir.1993). A labor union has no right to make use of an employer's real property for the purpose of communicating union messages, as long as the employees are not "beyond the reach of reasonable union efforts to communicate with them" by means that do not trespass upon the employer's property rights. *Lechmere,* 502 U.S. at ——, 112 S.Ct. at 849 (quoting *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 113, 76 S.Ct. 679, 685, 100 L.Ed. 975 (1956)). By a

parity of reasoning, employees who are union supporters have no right to make use of an employer's personal property for the purpose of communicating union messages, as long as the employees can make effective use of their own property for that purpose. See *Standard Oil Company of California,* 168 NLRB 153 (1967), and *Andrews Wire Corp.,* 189 NLRB 108 (1971), both of which are cases in which the Board recognized the employer's right to prohibit unapproved union insignia on employer-owned hard hats as long as the employees were not prohibited from displaying union insignia on their own clothes or other items of personal property.

The Board argues in its appellate brief that *Standard Oil of California* and *Andrews Wire* are not directly in point here because there were "special circumstances" in each of those cases that explained the employer's desire to keep its hard hats free of extraneous material. That is doubtless true.[7] The Board's brief goes on to argue, however, citing the decisions in *Malta Construction* and *Regal Tube Co.,* 245 NLRB 968 (1970), that "[t]he mere claim of a property interest" does not entitle the employer to decide how its property shall be used.

The use of the adjective, if we may say so, manifests a rather casual attitude toward the distinction between *meum et tuum.* "Mere" property, like life and like liberty itself, was not unimportant to the generation that gave us our Bill of Rights; making explicit what had been considered implicit in the Constitution from the beginning, the framers of the Fifth Amendment specifically provided that no person should be deprived of property without due process of law. They likewise provided that private property should not be taken for public use without just compensation. The legacy the framers left us in the Fifth Amendment is a precious one, and each generation must take care to see that it is not nibbled away.[8]

---

7. Windemuller contended before the ALJ, as it contends here, that in the instant case as well there were significant marketing and safety considerations that militated in favor of requiring removal of the stickers. The ALJ found that no such considerations existed, and we do not reach

the question of whether this finding was supported by substantial evidence.

8. The Fifth Amendment, as the Supreme Court recently reminded us, is "as much a part of the Bill of Rights as the First Amendment or the Fourth Amendment;" it "should [not] be relegat-

The Supreme Court, in the line of cases that originated in *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), and culminated in *Lechmere*, has repeatedly declined to let organizational rights trump property rights where there is no apparent need to do so. Nothing in the record of the case before us suggests that any such need exists here. As a matter of law, therefore, the fact that the hard hats were Windemuller's property provided justification enough for Windemuller's refusal to let the hats be stickered with union insignia.

## C. *Windemuller's Selection of Three Union Supporters for Layoff on May 18, 1990.*

■ The record leaves no room for doubt that because of an unexpected change in plans by the general contractor, three regular Windemuller employees who had been working on the riser project became available for reassignment at the end of the week of May 13, 1990. There is no room for doubt as to the reasonableness of Windemuller's decision to assign the three regular employees to the ongoing project in the lower levels of the building, displacing three other people who had been working there. The question is whether Windemuller singled out the three union adherents for displacement because of their public display of support for the union.

The ALJ found as a fact that the three union supporters would not have been laid off as early as May 18 but for their union activity. At least two of them, he found, would have remained on the job "much longer than one month" had they not been victims of anti-union discrimination. We are more than a little dubious as to the validity of the ALJ's estimate of the amount of time the men would have continued to work, and some of the reasons given by the ALJ in support of the finding of discrimination appear dubious as well. Disregarding the proffered reasons that lack adequate support in the record, however, we are satisfied that there is still sufficient evidence to justify the finding that the selection of the union adherents for layoff on May 18 was discriminatory.

The record contains undisputed testimony that on May 15 Windemuller superintendent Dick Thompson "became outraged" at the sight of the union stickers that four of the CES temporary employees had placed on the hardhats issued to them by the company. Mr. Thompson had a right to ask that the stickers be removed, as we have held, but the ALJ had a right to view Thompson's "outrage" as indicative of some degree of anti-union animus.

There is more. Foreman Barry Alan gave undisputed testimony indicating that Windemuller superintendent Kirk Strong (who, like superintendent Thompson, never took the stand) had told him at some point that the first workers to be laid off on the lower level project would be employees borrowed from other electrical contractors. Although Windemuller normally followed a "last in first out" policy, which would have put the CES people first in line to go, Strong was said to have explained that Windemuller's labor costs for the borrowed employees were higher than its labor costs for the CES workers. And it is undisputed that the costs for the borrowed employees were in fact somewhat higher. Yet on May 17, when superintendent Thompson telephoned Alan to identify the people who were to be laid off the next day, he named three of the four CES employees who had been displaying union paraphernalia. When Alan questioned this choice, moreover, Thompson used the words "union people" to refer to the individuals he said he had been told to lay off first. The phraseology is obviously not helpful to the company's cause.

Windemuller offers no reasonable explanation of why the one CES employee who was not a union person—a man named Randy Miller—happened to be kept on the job in preference to one of the three CES journeymen who were union people. It is true that Mike Stackpole, the other CES person who escaped layoff at this time, was also a union supporter; that is of little help to Windemuller, however, in light of Alan's uncontradicted testimony that Thompson said Stackpole was

ed to the status of a poor relation...." *Dolan v. City of Tigard,* — U.S. —, —, 114 S.Ct.

2309, 2320, 129 L.Ed.2d 304 (1994).

being kept on because he was only an apprentice and would thus cost the company less money.

Windemuller's brief offers a number of possible explanations as to why Windemuller might legitimately prefer to release temporary personnel before releasing personnel borrowed from other contractors. We have found nothing in the record, however, to show that these considerations did in fact inform the selection process. Although testimony was given by Bill DeDoes, the person whom Thompson was said to have named as the ultimate decisionmaker, DeDoes gave no reason at all for deciding to release the three union people in preference to three more expensive people borrowed from other contractors. The record is not without its ambiguities on this point, but the ambiguities are hardly sufficient to justify a reversal of the finding that the May 18 layoffs were discriminatory.

D. *Bill Quick's reassignment by CES and his ultimate departure from the new job.*

█ Bill Quick, the master electrician who started working for Windemuller as a CES temporary on August 7, 1990, first displayed his union organizer's pin the following Thursday. At noontime on Friday Roosevelt Tillman instructed him to report to CES Monday morning to begin a new job. The theory of the ALJ was that notwithstanding contrary testimony from both Windemuller and Tillman, someone from Windemuller must have contacted Tillman after learning that Quick was a union organizer and asked Tillman to take Quick off Windemuller's hands.

One problem with this theory is that the record contains abundant evidence that Roosevelt Tillman really did have another job; that it was a job which should have been right up Quick's alley; and that Tillman had decided no later than Wednesday—a day *before* Windemuller learned of Quick's union proclivities—to give the job to Quick. It is undisputed that Tillman's mother was having her apartment building remodeled and had reached a point in the remodeling project where she needed some electric work done.

It is undisputed that a portion of the electrical work could only be preformed by a licensed contractor, such as the "Bills' Electrical Service" listed on the master electrician's license that Quick showed Tillman when he was hired. And it is undisputed that Roosevelt Tillman, who was overseeing the apartment project for his mother, placed a long distance call to Quick's residence at 7:10 p.m. on Wednesday, August 8, 1990, and left a message on the answering machine for Quick to see him Friday. Neither CES nor Windemuller knew on August 8 that Quick was slated to become a union organizer.

The ALJ speculated that Tillman did not really place the call to Quick for the purpose of telling him to report for reassignment, as Tillman testified, but merely wanted to let Quick know that Tillman would be stopping at the job site the next day to drop off a timecard for Quick. The record does not contain a shred of support for this hypothesis. Quick himself indicated that he was expecting the timecard anyway. There was no need for Tillman to make sure that Quick would be available to receive the timecard, because the card could just as well be left with one of the foremen—as, in fact, it was. (Quick did not happen to be available when Tillman visited the job site on Thursday, and Tillman simply left the timecard and a CES handbook with Fred Syswerda, who gave the materials to Quick on Friday morning.)

The ALJ purported to find it "incredible" that Tillman should have pulled a qualified employee off a company job, and sent a replacement without advance notice to the customer, simply to get a remodeling job done for his mother. If Roosevelt Tillman really operated that way, the ALJ said, "it is probable that CES would not last long in business." [9] Further, said the ALJ,

"If Tillman were sincerely interested in having Quick do the remodeling work, then it is probable that he would have waited until the fall, when the Company was winding down, and then offer Quick a nice

---

9. CES was not established until May of 1989. Whether it is still in business we have no way of knowing, the company not having appeared in the instant enforcement proceeding.

indoor job. There was nothing urgent about the remodeling job."

This is very thin gruel indeed. It is apparent from the record that the people doing journeyman electrical work on Windemuller's Upjohn project were essentially fungible. There is no reason at all to suppose that Quick's replacement, journeyman Darwin Patterson, would have had the slightest difficulty in picking up Quick's work without delay. Windemuller had some advance notice of the switch, moreover, because Syswerda was told around noon on Friday of Quick's forthcoming reassignment, and Patterson testified that when he reported for work at the Upjohn building on Monday morning, August 13, the foreman greeted him with the words "You must be Darwin." And the notion that Tillman could just as well have let his mother's remodeling project remain half-finished until cold weather came, there being nothing "urgent" about completing the job once it had been started, rests on assumptions plucked out of thin air. Perhaps there are people who have been blessed with preternaturally patient and forebearing mothers, but there is no evidence at all that Mr. Tillman is among that number.

Finally, the ALJ found that "by offering Quick only an arrangement as an independent contractor, Tillman effectively terminated Quick as an employee." The Board's general counsel made no such allegation in the amended complaint, notwithstanding that IBEW Local 107 had filed an unfair labor practice charge to this effect, and the finding is not supported by substantial evidence. The evidence affirmatively shows, on the contrary, that Quick was perfectly willing to work on the Tillman project as an independent contractor. Quick ultimately quit the job not because he was required to function as a contractor—something he had done many times before—but because Tillman questioned the hours charged for off-site activities on Thursday and Friday and because Quick could not get as much premium pay as he wanted.

E. *Portions of the Board's order that are not contested.*

The ALJ recommended dismissal of some of the allegations against CES, but found that others—including the allegations that CES had illegally asked Darwin Patterson and Keith Wolfsen about union affiliations—were well founded. The finding as to Mr. Patterson is adequately supported by the record (see n. 4, *supra*), and although the finding as to Mr. Wolfsen strikes us as questionable (see n. 5, *supra*), CES has not challenged the finding and has not opposed enforcement of the remedial order. To the extent that we have not rejected the findings of illegal conduct on the part of CES in connection with our analysis of the findings regarding Windemuller, we shall allow the findings to stand and we shall grant enforcement of the remedial order against CES insofar as it is based on those findings.

The ALJ found that Windemuller and CES "codetermined" the "essential terms and conditions of employment" of electricians referred to Windemuller by CES, and were thus joint employers of such persons. *NLRB v. Checker Cab Co.*, 367 F.2d 692, 698 (6th Cir.1966), *cert. denied*, 385 U.S. 1008, 87 S.Ct. 715, 17 L.Ed.2d 546 (1967). Windemuller does not contest this finding and does not deny liability for the illegal questioning of Darwin Patterson by CES. Accordingly, and in light of our resolution of the issue discussed in Part III C of this opinion, we shall grant enforcement of the order against Windemuller insofar as it is based on (a) the interrogation of Darwin Patterson and (b) the layoff of Thomas Sosnowski, Steven Tishhouse and Larry Ketchum. In all other respects enforcement of the order against Windemuller will be denied.

Enforcement is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing opinion.

WELLFORD, Senior Circuit Judge, concurring in all respects except as to Part III C. in which he dissents.

I am in entire accord with the recitation of the factual background of this controversy and with almost all of Judge Nelson's full opinion dealing with the issues herein. I have some reservations as to that portion of part III C. of the opinion with respect to Windemuller Electric, Inc. ("Windemuller") and Construction Employment Services, Inc. ("CES") being deemed joint employers in any respect. On this record, Mike Windemuller and Roosevelt Tillman, who were

principals in these entities, followed their own independent agendas and I find it ironic that Windemuller is "tagged" by NLRB as a joint employer because it sought Tillman's help in hiring minority employees, both union and non-union. Because Windemuller does not seriously contest the order with respect to questioning Darwin Patterson, I concur as to that part of III C., but not as to the layoff of three CES employees.

As to III C., I would not enforce the order concerning the alleged improper layoff in May of 1990 of three *temporary* CES employees. Windemuller's Kirk Strong and Tillman (d/b/a CES) both testified that these workers were hired for a short period (from one to four weeks). The work involved lasted no more than two weeks. Even if the ALJ were supported in his determination that the three employees' union status played a part in their layoff after a week's work, I would conclude that this is a *de minimis* violation at best. There was no atmosphere at Windemuller of threats, intimidation or coercion against unions or organizers, or even a union "salt" as noted in the majority opinion. I, therefore, dissent from that portion of the opinion (III C. and E.) affirming the NLRB with respect to anything other than minimal back pay, if any, to Thomas Sosnowski, Steven Tishhouse, and Larry Ketchum.