**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3434
_____

FDRLST MEDIA, LLC,
Petitioner

v.

NATIONAL LABOR RELATIONS BOARD
_____

No. 20-3492
_____

NATIONAL LABOR RELATIONS BOARD,
Petitioner

v.

FDRLST MEDIA, LLC
_____

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board
(NLRB Case No. 02-CA-243109)
_____

Argued on November 10, 2021

Before: HARDIMAN, MATEY, and SCIRICA, *Circuit Judges*.

(Filed: May 20, 2022)

Jared McClain [Argued]
Institute for Justice
901 North Glebe Road
Suite 900
Arlington, VA 22203

Mark Chenoweth
Kara M. Rollins
New Civil Liberties Alliance
1225 19th Street, NW
Suite 450
Washington, DC 20036

    *Counsel for FDRLST Media, LLC*


Kimberly S. Hermann
Southeastern Legal Foundation
560 West Crossville Road
Suite 104
Roswell, GA 30004

    *Counsel for Amici Emily Jashinsky, Madeline Osburn, and Southeastern Legal Foundation, in support of FDRLST Media, LLC*

Thomas A. Berry
Trevor C. Burrus
Ilya Shapiro
CATO Institute
1000 Massachusetts Avenue, NW
Washington, DC 20001

>*Counsel for Amici CATO Institute, Reason Foundation, Individual Rights Foundation, DKT Liberty Project, Nadine Strossen, P.J. O'Rourke, Clay Calvert, Robert Corn-Revere, Michael James Barton, and Penn & Teller, in support of FDRLST Media, LLC*

Corbin K. Barthold
James Dunstan
Berin Szóka
TechFreedom
110 Maryland Avenue, NE
Suite 205
Washington, DC 20002

>*Counsel for Amicus TechFreedom, in support of FDRLST Media, LLC*

Alan Gura
Owen Yeates
Institute for Free Speech
1150 Connecticut Avenue, NW
Suite 801
Washington, DC 20036

>*Counsel for Amicus Institute for Free Speech, in support of FDRLST Media, LLC*

Jonathan S. Goldstein
Shawn M. Rodgers
Goldstein Law Partners, LLC
11 Church Road
Hatfield, PA 19440

    *Counsel for Amicus National Federation of Independent Business Small Business Legal Center, in support of FDRLST Media, LLC*


Ethan W. Blevins
J. David Breemer
Daniel M. Ortner
Pacific Legal Foundation
555 Capitol Mall
Suite 1290
Sacramento, CA 95814

    *Counsel for Amicus Pacific Legal Foundation, in support of FDRLST Media, LLC*

Peter Sung Ohr
Ruth E. Burdick
Iva Y. Choe
David Habenstreit
Micah P.S. Jost [Argued]
Gregory P. Lauro
Kira D. Vol
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20003

    *Counsel for National Labor Relations Board*

———————

OPINION OF THE COURT

———————

HARDIMAN, *Circuit Judge*.

FDRLST Media, LLC (Employer) petitions for review of an order of the National Labor Relations Board finding that a supervisor's message posted on Twitter was an unfair labor practice. The Board cross-petitions for enforcement. Because the Board's finding is not supported by substantial evidence, we will grant the petition for review, set aside the Board's order, and deny its petition for enforcement.

I

The Employer operates *The Federalist*, a right-leaning internet magazine that publishes commentary on cultural, political, and religious issues of current interest, including labor issues. In June 2019, the Employer found itself at the center of its own labor controversy. On June 6, media outlets reported that unionized employees of Vox Media, a left-leaning digital media company, walked off the job during union contract negotiations. That same day, Ben Domenech, executive officer of FDRLST Media and publisher of *The Federalist*, posted a tweet from his personal Twitter account that read: "FYI @fdrlst first one of you tries to unionize I swear I'll send you back to the salt mine." AR 68. Domenech's tweet appeared in the feeds of more than eighty thousand Twitter users who follow his account. The "@fdrlst" tag refers to *The Federalist*'s official Twitter account. At the time, the Employer had just seven employees, six of whom were writers and editors at *The Federalist*. At least one employee viewed

the tweet, but the record does not show that any employee expressed concern over its message.

The following day, Joel Fleming, a Massachusetts resident with no connection to FDRLST Media, filed an unfair labor practice charge with the Board's New York Region. The charge alleged that Domenech's tweet violated Section 8(a)(1) of the National Labor Relations Act of 1935 (NLRA or Act) and listed an Illinois address for the Employer, even though it is a Delaware limited liability corporation with a Washington, D.C. office.

Based on the charge, the Director of the NLRB's New York Region issued an unfair labor practice complaint against the Employer. The complaint alleged that Domenech's tweet "threatened employees with reprisals and implicitly threatened employees with loss of their jobs if they formed or supported a union." AR 44. The Employer moved to dismiss the complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue. While observing that its "case could conceivably be transferred to" the Board's Baltimore Region, the Employer "t[ook] no position . . . on the propriety of the complaint being transferred." AR 183. The Board denied the motion.

At a February 2020 hearing before a regional administrative law judge (ALJ) in New York City, the Employer entered what it described as a "special appearance" so it could object to personal jurisdiction. AR 6. The ALJ declined to revisit the Board's jurisdictional ruling and heard arguments on the complaint's merits. The Board's regional counsel presented his case without calling any witnesses and rejected the notion that Domenech's tweet would be understood as a joke. Instead, he pointed to *The Federalist*'s

6

editorial content as expressing Domenech's own "anti-union" stance, AR 14, and argued that a reasonable reader could interpret the tweet only as a threat against employee unionization.

The Employer denied the allegation. Citing concerns that calling witnesses would waive its jurisdictional objection, the Employer submitted affidavits from Domenech and two of the six employees he supervised. Domenech's affidavit explained that he intended the tweet as satire, expressing his "personal viewpoint on a contemporary topic of general interest." AR 151. The two employees averred that they viewed the tweet as a funny, satirical expression and did not perceive it to threaten any protected workplace activity. The ALJ admitted the affidavits into evidence over the regional counsel's objections.

The ALJ concluded that the tweet violated Section 8(a)(1) of the NLRA. *See FDRLST Media, LLC & Joel Fleming*, 370 N.L.R.B. No. 49, at 5–6 (Nov. 24, 2020). Observing that "salt mine" was an idiom "most often used to refer to tedious and laborious work," the ALJ determined that "a reasonable interpretation of the expression meant that working conditions would worsen or employee benefits would be jeopardized if employees attempted to unionize." *Id.* at 5. Concluding that the opening "FYI @fdrlst" "clearly directed [the tweet] to the employees of FDRLST Media and not to the general public," the ALJ found that the tweet was "an obvious threat," which, in "the totality of the circumstances . . . had no other purpose except to threaten the FDRLST Media employees with unspecified reprisal." *Id*.

The ALJ gave little weight to the employee affidavits and rejected Domenech's claim that his tweet was satire, since

7

"threats allegedly made in a joking manner [still] violate the" Act. *Id.* The ALJ also found the tweet's timing—which came on the heels of the Vox Media walkout—to be "significant," because it expressed Domenech's displeasure with the actions of unionized Vox employees. *Id.*

The Board affirmed the ALJ's decision and order with several modifications. *Id.* at 1. In adopting the ALJ's conclusion that the tweet was a prohibited threat, the Board disclaimed any reliance on *The Federalist*'s "anti-union" editorials or the tweet's temporal proximity to the Vox Media walkout, since there was no record evidence that FDRLST Media employees were aware of either. The Board also concluded that the ALJ erred in admitting the affidavits without establishing that Domenech and the two employees were unavailable to testify. But the Board found that error harmless, stating that employer intent and subjective employee perception were "irrelevant" to its inquiry. *Id.* at 1 n.3. In addition to entering the cease-and-desist order recommended by the ALJ, the Board ordered the Company to direct Domenech to delete his tweet.

The Employer petitioned for review of the Board's decision and order; the Board cross-petitioned for enforcement.[1]

---

[1] Because FDRLST Media is a Delaware corporation, we have jurisdiction over the petition for review and cross-petition for enforcement under 29 U.S.C. §§ 160(f) and 160(e), respectively.

## II

The Employer first argues that the Board lacks authority to issue a complaint based on a charge filed by a person who was not "aggrieved" by the alleged unfair labor practice. We disagree. Controlling precedent and the plain language of the Act affirm that the Board acted within its statutory authority when it issued a complaint based on Fleming's charge.

### A

The NLRA empowers the Board "to prevent any person from engaging in any unfair labor practice." 29 U.S.C. § 160(a). To that end, the Act grants the Board broad authority to issue unfair labor practice complaints, conduct hearings, subpoena witnesses, make findings, and order remedial actions. *Id.* §§ 160(b)–(c), 161.

The first sentence of Section 10(b) of the Act explains the circumstances under which the Board can issue an unfair labor practice complaint. As originally enacted in 1935, that sentence reads:

> Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein

9

> fixed, not less than five days after the serving
> of said complaint.

NLRA, ch. 372, § 10(b), 49 Stat. 449, 453 (1935) (codified as amended at 29 U.S.C. § 160(b)). In 1947, Congress amended the statute to its present form, adding this proviso to the end of Section 10(b)'s first sentence:

> *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge.

Labor Mgmt. Relations Act, ch. 120, sec. 101, § 10(b), 61 Stat. 136, 146 (1947).

The opening phrase of Section 10(b)—"[w]henever it is charged"—says nothing about *who* may file a charge. Since its enactment, the Board has interpreted the Act to permit "[a]ny person" to file a charge. 29 C.F.R. § 102.9 ("Any person may file a charge alleging that any person has engaged in or is engaging in any unfair labor practice affecting commerce."); *see Gen. Furniture Mfg. Co.*, 26 N.L.R.B. 74, 76 n.3 (1940) ("The Board has provided in its Rules and Regulations that 'a charge that any person has engaged in . . . unfair labor practices . . . may be made by any person or labor organization.'"). According to the Board, the charge's "function" is to call

10

attention "to the fact that certain unfair labor practices are alleged to have been committed. A charge is merely the means whereby action on the part of the Board is instituted and is not a formal pleading filed by a party to the proceeding." *Gen. Furniture Mfg.*, 26 N.L.R.B. at 76 n.3.

B

The Employer contends the Board's "any person" rule violates Section 10(b). But that contention is foreclosed by our caselaw. "This court previously has upheld the validity of the Board's ['any person'] rule." *NLRB v. Local No. 42, International Association of Heat & Frost Insulators*, 469 F.2d 163, 165 (3d Cir. 1972) (per curiam) (citing *NLRB v. Television & Radio Broadcast Studio Employees, Local 804*, 315 F.2d 398 (3d Cir. 1963)). In doing so, we rejected the very same argument the Employer makes here—namely, that "the Board rule which grants standing to 'any party' exceeds the statutory grant and is invalid" because "the Act grants standing only to an 'aggrieved party.'" *Id.*

We first affirmed the validity of the Board's rule nearly sixty years ago in *Television & Radio Broadcast Studio Employees, Local 804*, 315 F.2d at 400–01. In that case, we concluded the Board had authority to issue a complaint against a union based on a charge filed by a company, even though the company's employees—not the company, itself—were harmed by the union's alleged unfair practice. *Id.* at 401.

In doing so, we cited the Supreme Court's interpretation of Section 10(b) in *NLRB v. Indiana & Michigan Electric Co.*, 318 U.S. 9, 17–18 (1943). *Television & Radio Broadcast Studio Employees, Local 804*, 315 F.2d at 401. The Supreme Court decided *Indiana & Michigan Electric* within a decade

11

after the Act's passage and rejected a challenge to the Board's jurisdiction analogous to the one the Employer makes here. 318 U.S. at 17–18. In that case, an employer argued that the Board lacked authority to consider a charge, allegedly filed in bad faith, by a union that had engaged in misconduct. *Id.* at 16–17. The Court's reasoning tracked the Board's justification for its "any person" rule, observing that "[t]he charge is not proof" and "does not even serve the purpose of a pleading." *Id.* at 18. Because the charge "merely sets in motion the machinery of an inquiry," the Court concluded that even the "[d]ubious character, evil or unlawful motives, or bad faith" of a charging party "cannot deprive the Board of its jurisdiction to conduct the inquiry." *Id.*

In explaining its decision, the Supreme Court described the scope of Section 10(b), which did not yet include the time-limitation proviso. The Court observed that the Act "requires a charge before the Board may issue a complaint, but *omits any requirement that the charge be filed by a labor organization or an employee.*" *Id.* at 17 (emphasis added). The Court described the charging party as an "informer" and cited legislative history indicating that even a "stranger to the labor contract" could file a charge, since "it was often not prudent for the workman himself to make a complaint against his employer." *Id.* at 17–18 (citing *Hearings on S. 1958 Before the S. Comm. on Educ. and Labor*, 74th Cong. 430–32 (1935)).

Four years after the Court decided *Indiana & Michigan Electric*, Congress added the time-limitation for filing charges, with its "person aggrieved" exception for those serving in the armed forces. Labor Mgmt. Relations Act § 10(b). But Congress left Section 10(b)'s original charging clause undisturbed. Since then, the Court has repeatedly given effect to the Board's "any person" rule, affirming the Board's

12

authority to act on charges filed by parties outside the labor relationship. *See, e.g.*, *Plumbers, Steamfitters, Refrigeration, Petroleum Fitters, & Apprentices of Local 298 v. Cnty. of Door*, 359 U.S. 354, 358 (1959) (Board had authority to consider charge filed by county against union that picketed its contractor's use of non-union labor); *Local Union No. 25 of International Brotherhood of Teamsters v. N.Y., New Haven, & Hartford R.R. Co.*, 350 U.S. 155, 160–61 (1956) (Board had authority to consider charge filed by railroad against truckers' union that interfered with its trailer transport). Critically for our purposes, the Court has done so without inquiring whether the charging party was actually aggrieved.

Over the last seventy years, we and our sister courts have faithfully followed the Supreme Court's example and upheld the Board's authority to act on charges filed by "any person," without requiring a charging party to show how it was aggrieved by the alleged unfair labor practice. *See, e.g.*, *Local No. 42, International Association of Heat & Frost Insulators*, 469 F.2d at 164–65 (rejecting union's claim that only an "aggrieved party" has standing to file charge under the Act); *Elec. Contractors, Inc. v. NLRB*, 245 F.3d 109, 121 (2d Cir. 2001) ("[T]he Supreme Court long ago made clear that the identity of the charging party is irrelevant to a determination of whether the Board has jurisdiction."); *S. Furniture Mfg. Co. v. NLRB*, 194 F.2d 59, 61 (5th Cir. 1952) ("There is no requirement that [a charge] be filed by a labor organization, by the discharged employee, or even by any employee. Strangers to the labor contract are permitted to make the charge."); *NLRB v. Gen. Shoe Corp.*, 192 F.2d 504, 505 (6th Cir. 1951) (concluding that whether union filing charge had any members employed by company was "immaterial" to Board's jurisdiction over the charge); *NLRB v. Chauffeurs, Teamsters*

13

*& Helpers Local 364*, 274 F.2d 19, 25 (7th Cir. 1960) ("The Act does not place such restrictions on the charging party, but provides, Section 10(b), 'Whenever it is charged,' the Board shall have power to investigate, etc. Anyone may file a charge."); *NLRB v. Stationary Engineers, Local 39*, 746 F.2d 530, 532 n.1 (9th Cir. 1984) (stating that an employee could file a charge, even though he was not actually fined by the union); *Raymond Interior Sys., Inc. v. NLRB*, 812 F.3d 168, 178 (D.C. Cir. 2016) ("Any person may file an unfair labor practice charge with the Board."). The Employer's interpretation of Section 10(b), which would require a person filing a charge to prove he was aggrieved, contravenes this chorus of precedent.[2]

---

[2] Our concurring colleague would jettison controlling precedent interpreting Section 10(b) in favor of his own textual analysis. But only the Supreme Court has the power to overturn *Indiana & Michigan Electric*. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997). And the fact that *Indiana & Michigan Electric* was decided before the statute was amended does not carry the day because our Court applied that same reasoning in *Television & Radio Broadcast Studio Employees, Local 804* and *Local No. 42, International Association of Heat & Frost Insulators*, both of which were decided well after the statute was amended. In addition, the concurrence's reliance on dissenting and concurring opinions from courts outside the Third Circuit is as telling as it is unavailing. Regardless of the persuasive force of such opinions, we are bound by our own precedents unless and until this Court, sitting en banc, alters them. Third Cir. I.O.P. 9.1; *see Joyce v. Maersk Line, Ltd.*, 876 F.3d 502, 508 (3d Cir. 2017).

14

Moreover, the Employer's attempted restriction on the Board's authority is inconsistent with how the Act operates. As the Supreme Court explained in *Indiana & Michigan Electric*, the charge "merely sets in motion the machinery of an inquiry." 318 U.S. at 18. The charging party serves as an "informer" and need not demonstrate any personal injury to file a charge. *Id.* Like a witness to a crime who can file a police report, a "stranger to the labor contract" who witnesses an unfair labor practice can file a charge with the Board. *Id.* at 17–18. The Board thus had authority to act on Fleming's charge, even if Fleming was not personally aggrieved by Domenech's tweet.

Contrary to the Employer's assertion, our decision to affirm the Board's "any person" rule does not "distort[] the legislative scheme" by "[a]llowing any random person to subject a company to a government-directed and funded unfair-labor-practice action." FDRLST Media Br. 17. Not every filed charge leads to an unfair labor practice complaint. "The Board has wide discretion in the issue of complaints. . . . It is not required by the statute to move on every charge; it is merely enabled to do so." *Ind. & Mich. Elec. Co.*, 318 U.S. at 18. Where a charge is baseless or made in bad faith, the Board can—and should—refrain from issuing, or dismiss, a complaint. *See id*. at 18–19.

C

Against decades of contrary precedent, the Employer argues that the text of Section 10(b) reveals Congress's intent to allow only "persons aggrieved" by the alleged unfair labor practice to file charges. *See* 29 U.S.C. § 160(b). "[E]very exercise of statutory interpretation begins with an examination of the plain language of the statute." *Register v. PNC Fin. Servs. Grp., Inc.*, 477 F.3d 56, 67 (3d Cir. 2007) (quoting

15

*Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001)). And "[t]he words of a statute are not to be lightly jettisoned by courts looking to impose their own logic on a statutory scheme." *In re Visteon Corp.*, 612 F.3d 210, 219 (3d Cir. 2010). While Congress could have imposed the limitation the Employer suggests, the statute's plain language and structure show that it did not do so.

The first clause of Section 10(b) establishes a general charging rule: the Board may issue a complaint "[w]henever it is charged that any person has engaged in any . . . unfair labor practice." 29 U.S.C. § 160(b). This clause, written in the passive voice, places no restrictions on who may file an actionable charge.

The subsequent proviso of Section 10(b) imposes a time limitation on that charging rule: the Board can issue a complaint only if the alleged unfair labor practice occurred no "more than six months prior to the filing of the charge with the Board." *Id*. The proviso includes a narrow exception to that time limitation, granting an extension if the "person aggrieved" by the alleged unfair labor practice could not timely file a charge because of military service. *Id.* Based on the statute's plain language and structure, the most natural reading is that the "person aggrieved" limitation applies only to the proviso's time-limitation exception, not to the general charging rule (which places no restrictions on the charging party). Neither the Employer nor our concurring colleague persuasively explains why a restriction contained in an exception to the proviso's time-limitation should be read to apply to the general rule.

The natural reading of the statute makes practical sense, as well. Placing a time limitation on filing an actionable

16

charge—with a narrow exception for members of the armed services who were subject to an unfair labor practice—represents a reasonable trade-off between achieving "repose and stability in labor relations" and acknowledging the difficulty of reporting a charge while on military duty, Board Br. 41, which was a particularly relevant concern when the statute was amended in 1947, right after World War II.[3]

The Employer's arguments based on judicial doctrines of standing and zone-of-interests are no more persuasive. "The Board is not a court; it is not even a labor court; it is an administrative agency charged by Congress with the enforcement and administration of the federal labor laws." *Shepard v. NLRB*, 459 U.S. 344, 351 (1983). "[I]t is well settled that there are wide differences between administrative agencies and courts." *Id*. (citations omitted). Agencies "are not constrained by Article III of the Constitution; nor are they governed by judicially-created standing doctrines restricting access to the federal courts," including the zone-of-interests test. *Envirocare of Utah, Inc. v. Nuclear Regul. Comm'n*, 194 F.3d 72, 74–75 (D.C. Cir. 1999). So long as the Board acts within its statutory authority, standing analysis is irrelevant to the question of who can file an actionable charge. *See id.* at 75.

---

[3] Even if we could disregard binding caselaw and thought Section 10(b) was silent as to who can file an unfair labor practice charge, the Employer's interpretation would not prevail because, as we explained, the Board's "any person" rule is a permissible construction of the Act. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984).

17

\*　　\*　　\*

The NLRA is remarkably broad in scope and power. Its jurisdictional provision, written in the passive voice, places no limits on who may file a charge. The Supreme Court has recognized—and has done nothing to cabin—this capacious authority. So the circuit courts of appeals (including this one) have consistently upheld the Board's rule that "any person" may precipitate an unfair labor practice investigation. Unfortunate as it may be, the Act as written and interpreted empowers a politically-motivated busybody as much as a concerned employee or civic-minded whistleblower.

We reaffirm today that Section 10(b) places no limitations on who may file an actionable unfair labor practice charge. So the Board had statutory authority to address Fleming's charge.

## III

The Employer also argues that the Board's New York Region lacked personal jurisdiction over the company and that its New York proceedings violated due process. We disagree with both arguments.

## A

"[T]here is a significant difference between the concept of 'jurisdiction' in the judicial context and in the administrative context." *1621 Route 22 W. Operating Co. v. NLRB*, 825 F.3d 128, 140 (3d Cir. 2016) (citing *City of Arlington v. FCC*, 569 U.S. 290, 296–97 (2013)). "When agencies are charged with administering congressional statutes, '[b]oth their power to act and how they are to act is authoritatively prescribed by

18

Congress.'" *Id.* (alteration in original) (quoting *City of Arlington*, 569 U.S. at 297).

We thus determine the scope of the Board's jurisdiction by interpreting the statute, not by applying the familiar minimum-contacts test that governs an Article III court's personal jurisdiction. Here, "Congress . . . vest[ed] in [the Board] nationwide jurisdiction to adjudicate controversies within the Act's purview." *Local 926, International Union of Operating Engineers v. Jones*, 460 U.S. 669, 681 (1983). The Board's organization into regional offices for administrative convenience does not divest any individual office of the Board's nationwide authority. *See, e.g.*, 29 U.S.C. § 155 ("The Board may, by . . . such agents or agencies as it may designate, prosecute any inquiry necessary to its functions *in any part* of the United States." (emphasis added)); 29 U.S.C. § 161(1) (authorizing the Board or any designee to compel "attendance of witnesses and the production of . . . evidence . . . *from any place* in the United States or any Territory or possession thereof, *at any designated place of hearing*" (emphasis added)).

The Act grants the Board jurisdiction over entities whose operations have at least a de minimis effect on interstate commerce. 29 U.S.C. § 160(a); *NLRB v. Fainblatt*, 306 U.S. 601, 607 (1939). In addition, the Board has adopted discretionary standards, stating it will exercise jurisdiction only over "those cases, which, in its opinion, have a substantial effect on commerce" based on the volume and character of business conducted. Off. of the Gen. Couns., NLRB, *An Outline of Law and Procedure in Representation Cases* § 1-100 (2017); *see* Off. of the Gen. Couns., NLRB, *National Labor Relations Board Casehandling Manual for Unfair Labor Practice Proceedings* § 11700 (2021). The Employer

19

stipulated that it meets the Board's statutory and discretionary jurisdictional standards. So the Board, including its New York Region, has jurisdiction over the Employer for unfair labor practice complaints.[4]

B

The Employer argues that even if the Board had jurisdiction, the adjudication in the New York Region violated its right to due process of law. Again, we are unpersuaded.

The Employer is correct that regional proceedings must comport with constitutional requirements, including due process. *Vasquez v. Van Lindt*, 724 F.2d 321, 327 (2d Cir. 1983) (citing *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973)) (Due process "applies to all adjudicatory proceedings before[] . . . administrative agencies."). While general "principles of due process require an agency to follow its own regulations," *Marshall v. Lansing*, 839 F.2d 933, 943 (3d Cir. 1988) (citations omitted), not every regulatory breach is a

---

[4] We also reject the Employer's argument that, because Domenech's tweet was posted from his personal Twitter account, it cannot be attributed to the Employer. Domenech was the executive officer of the Employer and publisher of its internet magazine. In those roles, he met the statutory requirements for a supervisor and agent and sometimes used his personal Twitter account for company purposes—including to promote the Employer's media content. The Employer can thus be held responsible under the Act for Domenech's tweets from his personal account. *See* 29 U.S.C. § 152(1), (13); *NLRB v. Schroeder*, 726 F.2d 967, 970–71 (3d Cir. 1984) (attribution in the labor context is based on traditional agency principles).

constitutional violation. When an agency violates a rule that does not "protect fundamental statutory or constitutional rights," the litigant must also show prejudice to make out a due process claim. *Leslie v. Att'y Gen.*, 611 F.3d 171, 178 (3d Cir. 2010); *Chong v. INS*, 264 F.3d 378, 389 (3d Cir. 2001).

Under Board regulations, "a charge must be filed with the Regional Director for the Region in which the alleged unfair labor practice has occurred or is occurring." 29 C.F.R. § 102.10. The Board's General Counsel, however, has broad authority to transfer charges between Regions as "necessary to effectuate the purposes of the Act or to avoid unnecessary costs or delay," *id.* § 102.33(a), and Regional Directors can, on their "own motion or upon proper cause shown by any other party," change the hearing location, *id.* § 102.16(a).

It is unclear where the Employer's alleged unfair labor practice—an internet tweet—"occurred" for purposes of the Board's filing regulation. But even if the tweet occurred outside the New York Region—so that Fleming's filing violated 29 C.F.R. § 102.10—the Employer has not shown that its due process rights were violated by the New York proceedings.

The Board's charge-filing regulation, 29 C.F.R. § 102.10, does not "protect[] fundamental statutory or constitutional rights." *See Leslie*, 611 F.3d at 180. "[W]here a charge should be filed is essentially a venue matter." *The Earthgrains Co.*, 351 N.L.R.B. 733, 733 n.2 (2007) (citing *Allied Prods. Corp.*, 220 N.L.R.B. 732, 733 (1975)). And venue is a matter of convenience; it does not implicate fundamental constitutional rights. *See* 17 *Moore's Federal Practice* § 110.01 (Matthew Bender 3d ed.). Nor does the Act provide a statutory right to venue. So the Employer must show

it was prejudiced by having to defend against the unfair labor practice complaint in the New York Region to obtain relief on due process grounds.

The Employer has not shown prejudice. It had notice of the complaint's allegations, agreed to the stipulated facts, and had a full and fair opportunity to defend against the allegations on the merits before the ALJ in the New York Region. Therefore, any error by the Board or its regional office in adjudicating the complaint in the New York Region did not result in prejudice that would require reversal of the Board's decision. *See, e.g.*, *NLRB v. Ingredion Inc.*, 930 F.3d 509, 519 (D.C. Cir. 2019) (citation omitted) (finding no reason to reverse the Board's decision where the company "received a 'full and fair opportunity to litigate the matter'" and failed to identify any instance of prejudice).

Even more fundamentally, the Employer never requested a transfer (as permitted by 29 C.F.R. § 102.33(a)) or a relocation (as permitted by 29 C.F.R. § 102.16(a)). Instead, the Employer expressly "t[ook] no position . . . on the propriety of the complaint being transferred to" another Region and pressed its argument for dismissal. AR 183. It may have been preferable for the Board to have transferred the charge or relocated the hearings to a Region with a connection to the Employer, but absent any request for transfer or relocation from the Employer, we cannot say that conducting the hearing "in the Region where the charge originated," in compliance with Board rules, 29 C.F.R. § 101.10, was an abuse of discretion, much less a deprivation of due process. *See Napleton 1050, Inc. v. NLRB*, 976 F.3d 30, 39 (D.C. Cir. 2020).

22

## IV

We turn finally to the merits of the case and consider the Board's conclusion that Domenech's Tweet was an unfair labor practice under Section 8(a)(1) of the NLRA. Reviewing the record as a whole, we conclude that the Board's determination that a reasonable employee would view Domenech's Tweet as a threat is not supported by substantial evidence. So we will set aside the Board's finding of an unfair labor practice.

We exercise plenary review over the Board's legal conclusions, deferring to its reasonable interpretations of the Act. *NLRB v. ImageFIRST Unif. Rental Serv., Inc.*, 910 F.3d 725, 732 (3d Cir. 2018). And we accept the Board's factual determinations if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e), (f); *see also ImageFIRST*, 910 F.3d at 732. "Substantial evidence [requires] more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," including "whatever in the record fairly detracts from [the evidence's] weight." *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 606 (3d Cir. 2016) (quoting *Tri-State Truck Serv., Inc. v. NLRB*, 616 F.3d 65, 69 (3d Cir. 1980)). So long as this standard is met, "we will not disturb the Board's factual inferences, even if we would have made a contrary determination." *Citizen's Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001).

Section 8(a)(1) prohibits employers from engaging in practices that "interfere with, restrain, or coerce employees in the exercise" of their protected rights to organize, collectively bargain, or engage in other union activity. 29 U.S.C. § 158(a)(1). An employer is not barred from communicating

his views on unions—even his anti-union views—to his employees, but he cannot threaten employees with reprisals or promise them benefits in relation to unionization. *NLRB v. Garry Mfg. Co.*, 630 F.2d 934, 938 (3d Cir. 1980) (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969)); 29 U.S.C. § 158(c).

But what constitutes a prohibited "threat"? To qualify as such, an employer's statement must warn of adverse consequences in a way that "would tend to coerce a reasonable employee" not to exercise her labor rights. *Garry Mfg. Co.*, 630 F.2d at 938. The test for coercion is objective: "the employer's intent is irrelevant and the proper inquiry is the impression of a reasonable employee." *Allegheny Ludlum Corp. v. NLRB*, 301 F.3d 167, 176 (3d Cir. 2002). Proof of actual coercion is unnecessary; the tendency of an employer's statement to coerce a reasonable employee is sufficient to find an unfair labor practice. *Garry Mfg. Co.*, 630 F. at 938. The Board's General Counsel bears the burden of proving the statement's tendency to coerce. *N. Cambria Fuel Co. v. NLRB*, 645 F.2d 177, 182–83 (3d Cir. 1981).

The employer's alleged threat is not viewed in a vacuum, however. When considering an alleged unfair labor practice, an employer's conduct must be examined "in light of *all* the existing circumstances." *Wheeling-Pittsburgh Steel Corp. v. NLRB*, 618 F.2d 1009, 1020 (3d Cir. 1980) (emphasis added) (citations omitted); *see also NLRB v. Va. Elec. & Power Co.*, 314 U.S. 469, 479 (1941) (The Board's finding of an unfair labor practice must be based "upon the whole course of conduct revealed by [the] record."). Context is an important part of language, and that's especially true where, as in this case, pure speech is at issue.

24

The ALJ found that Domenech's tweet was "an obvious threat" that "had no other purpose except to threaten the FDRLST [Media] employees with unspecified reprisals." *FDRLST Media*, 370 N.L.R.B. at 5. The Board agreed. In adopting the ALJ's finding, the Board disclaimed any reliance on the tweet's timing or *The Federalist*'s editorial content, leaving only the words of the tweet, devoid of any context, as support. But the Board erred when it disregarded relevant contextual evidence. *ImageFIRST*, 910 F.3d at 736 (citation omitted). Even more problematic than the timing and editorial content the Board ignored are the circumstances surrounding the tweet that the Board and the ALJ never considered. Had the Board considered the tweet's full context, it could not have concluded that a reasonable FDRLST Media employee would view the tweet as a threat of reprisal.

For starters, FDRLST Media is a tiny media company. Its six employees (not including Domenech) are writers and editors. The tweet's suggestion that these employees might be sent "back" to work in a "salt mine" is farcical. The image evoked—that of writers tapping away on laptops in dimly-lit mineshafts alongside salt deposits and workers swinging pickaxes—is as bizarre as it is comical. So from the words of the tweet alone, we cannot conclude that a *reasonable* FDRLST Media employee would view Domenech's tweet as a plausible threat of reprisal.

The ALJ rightly noted that the salt mine idiom "most often . . . refer[s] to tedious and laborious work," *FDRLST Media*, 370 N.L.R.B. at 5, but the Board failed to realize that "[t]hreatening statements are not usually made in bantering terms" like these. *NLRB v. Champion Labs., Inc.*, 99 F.3d 223, 229 (7th Cir. 1996) (citing *NLRB v. Windemuller Elec., Inc.*, 34 F.3d 384, 392 (6th Cir. 1994)). To conclude that

25

Domenech's tweet is a "thinly veiled statement[] concerning adverse consequences," *Garry Mfg. Co.*, 630 F.2d at 940, requires some additional evidence of the tweet's coercive tendency. But the Board points to none.

The Supreme Court has instructed, "[a]ny assessment of the precise scope of [impermissible] employer expression, of course, must be made in the context of its labor relations setting." *Gissel Packing Co.*, 395 U.S. at 617. Yet neither the Board nor the ALJ discussed the labor environment at FDRLST Media when Domenech posted his tweet. Significantly, this Court has never affirmed a finding of an unfair labor practice based on employer speech alone absent any indicia of labor friction.[5] And in this case, the Board points

---

[5] We have found employer speech to be an unfair labor practice in several cases where labor strife existed. *See, e.g.*, *Elec. Prods. Div. of Midland-Ross Corp. v. NLRB*, 617 F.2d 977, 984–85 (3d Cir. 1989) (company notified employees that it was closing an unprofitable unionized plant shortly before a pending union election); *Garry Mfg. Co.*, 630 F.2d at 938–40 (leaflets and letters sent to employees during a union campaign that implied adverse consequences if the union won election); *Hedstrom Co.*, 629 F.2d at 314–15 (plant manager's coercive questions to a striking employee); *id.* at 315 (company president's comments to an employee "troublemaker" on the day workers returned from a strike, implying rules would be enforced more stringently against the employee); *id.* at 316 (supervisor's comment to striking employee that she would not have a job if she sought to return to the plant); *Stein Seal Co. v. NLRB*, 605 F.2d 703, 705–06 (3d Cir. 1979) (statements by company founder during a speech to employees that implied

26

to no history of labor strife, no evidence of antagonism, nor even a single example of labor-management tension. The Board cited only one brief tweet, posted from a supervisor's personal Twitter account. The record contains no sign—indeed, no inkling—of any circumstance at FDRLST Media that leads us to conclude that a reasonable employee would interpret Domenech's tweet as a veiled threat.

We also think it significant that *The Federalist* "publishes commentary on a wide variety of contemporary newsworthy and controversial topics," including matters involving politics and labor relations, AR 69, and that Domenech used his personal Twitter account to promote and discuss the magazine's commentary. The record does not show that Domenech ever used this account to communicate with employees or that employees were required to follow it. Taken together, a reasonable FDRLST Media employee who became privy to Domenech's tweet—posted the same day as the Vox Media walkout—would be far more likely to view the tweet as "commentary on a . . . contemporary newsworthy and

---

retaliation if union won election); *NLRB v. Triangle Publ'ns, Inc.*, 500 F.2d 597, 598 (3d Cir. 1974) (supervisor's questions to employee who was "collecting the names and addresses of his co-workers so that a union could get in touch with them"); *Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 9–11 (3d Cir. 1969) (company president's remarks during union contract negotiations that implied company may close if contract was not ratified).

controversial topic[]" than as a threat that implicated her status with the Employer.[6] *See* AR 69.

The Board also went too far when it opined that employees' "subjective interpretations of [an employer's conduct] are irrelevant to determining whether" the employer committed an unfair labor practice. *FDRLST Media*, 370 N.L.R.B. at 1 n.3. We have held that employees' subjective impressions are *not dispositive*; not that they are *irrelevant*.[7] *See, e.g.*, *Hedstrom Co.*, 629 F.2d at 316–17 (affirming the Board's finding that a supervisor's statement was coercive, despite employee testimony suggesting otherwise, because the

---

[6] The Board did not consider the timing of the tweet because it had "no evidence that employees who viewed the tweet were aware of . . . the walkout." *FDRLST Media*, 370 N.L.R.B. at 1 n.4. But the Board's regional counsel could have solicited this evidence by calling any FDRLST Media employee to testify. The Board cannot avoid the reasonable inference that employees of a media company that focuses on "contemporary newsworthy and controversial topics," AR 69, would be aware of a newsworthy and controversial event involving another internet media company simply because the regional counsel chose not to inquire.

[7] The Board's cited authority, *American Freightways Co.*, 124 N.L.R.B. 146, 147 (1959), is consistent with our caselaw. *See FDRLST Media*, 370 N.L.R.B. at 1. *American Freightways* states that the test for an unfair labor practice "does not turn on the employer's motive or on whether the coercion succeeded or failed," *id.*, which is the same as saying that neither employer motive nor proof (or absence) of actual coercion is dispositive.

record supported both interpretations). We have acknowledged that subjective impressions can sometimes be helpful to determine how a reasonable employee would objectively view her employer's conduct. *See, e.g.*, *Garry Mfg. Co.*, 630 F.2d at 941 & n.6 (considering employee testimony that removal of plant machinery before a union election caused "panic and fear among the employees" to support a finding that the removal was reasonably "understood as a threat of reprisal should the Union win the election").

Employees' subjective impressions are especially helpful where, as here, the employer claims his statement was made in jest. Humor is subjective. What is funny to a fisherman may be lost on a farmer. A quip about New England winters is unlikely to get a laugh in Alaska. The propensity for jokes to fall flat for want of context or audience understanding has given rise to idioms like "I guess you had to be there" and "too soon?" Excluding context and viewing a statement in isolation, as the Board did here, could cause one to conclude that "break a leg" is always a threat. But when expressed to an actor, singer, dancer, or athlete, that phrase can reasonably be interpreted to mean only "good luck." *Break a leg*, McGraw-Hill's American Idioms Dictionary (Richard A. Spears ed., 4th ed. 2000). Consistent with these commonsensical observations, some of our sister courts have considered employees' subjective responses when evaluating whether employer speech or expressive conduct was reasonably viewed as a joke or a threat.

For example, in *Federal-Mogul Corp. v. NLRB*, the Board concluded that when a supervisor burned a union campaign card while bantering with employees, he interfered with a union election in violation of Section 8(a)(1). 566 F.2d 1245, 1253 (5th Cir. 1978). The Fifth Circuit disagreed. *Id.*

29

Observing that the employees and supervisor were engaged in "horseplay" that involved "teasing" and citing an employee's testimony that he had "'snickered' and 'laughed' when the incident occurred," the Court concluded, "[i]t is obvious that the entire incident was a joke." *Id*. "The incident is not to be taken out of context," the Fifth Circuit rightly cautioned, and "must be considered along with all of the facts and circumstances existing at the time." *Id.*

A Sixth Circuit case, *NLRB v. Windemuller Elec., Inc.*, is also instructive. There, unionized electrical workers had flooded a non-union electrical contractor with applications, and though the contractor processed the applications, it hired none of the union applicants. 34 F.3d at 386. At a company breakfast three months later, the contractor's vice president told employees that the company was looking to hire. *Id.* In response to an employee question, the vice president admitted, "yeah, [we've] had a lot of applications from the union," which prompted laughter from the employees. *Id.* at 387. A branch manager then reiterated that the company needed more electricians. *Id.* The ALJ concluded that the "plain implication" of the vice president's remark was that he would not hire workers interested in unionization—a threat that violated Section 8(a)(1). *Id.* at 392. The Board agreed. *Id.* at 385.

The Sixth Circuit disagreed, holding that the Board's finding of a threat lacked substantial evidence. *Id.* at 393. Though the vice president's remark "may not have been politically correct," "[i]t got a laugh" from employees. *Id.* at 392. As the court sensibly noted, "people who are being threatened do not usually find it amusing." *Id.* The Sixth Circuit also found the "silence of the record" to be

30

"significant," noting that "not a single" worker testified to feeling threatened or coerced. *Id.* at 393.

The Board discounts *Federal-Mogul* and *Windemuller* by noting that neither case "holds that threats of retaliation are lawful as long as someone laughs." Board Br. 17. The Board is right to that extent. But the Fifth and Sixth Circuit analyses also show that employees' subjective responses can be relevant to determining whether a reasonable employee—who is familiar with her employer and the context of a remark—would tend to be coerced. This is particularly true where, as here, a third party with no connection to the employer or the employees—and who lacks knowledge of relevant context—files a charge against an employer with no history of labor problems.

The record contains no evidence that any FDRLST Media employee perceived Domenech's tweet as a threat, and the Board failed to even acknowledge that noteworthy gap in the record.[8] Because the charge was filed by an unrelated third-party, the alleged unfair labor practice was pure speech, and the meaning of the employer's statement is open to question,

---

[8] The Board acted within its discretion when it excluded from consideration the affidavits offered by the Employer. *See NLRB v. Domsey Trading Corp.*, 636 F.3d 33, 37 (2d Cir. 2011); 29 C.F.R. § 101.10(a). But the exclusion was also expedient, since the two employee affidavits contradict the Board's conclusion: the employees stated that they did not view Domenech's tweet as a threat, but as a "funny," "obviously sarcastic," "pithy," and "satirical" expression of Domenech's personal views. AR 156, 158.

31

the "silence of the record" is significant and should have been considered, *see Windemuller Elec., Inc.*, 34 F.3d at 393.

Finally, the mode of communication also weighs against finding that Domenech's tweet would tend to coerce a reasonable FDRLST Media employee. Domenech posted his message on Twitter, a public platform that limits tweets to 280 characters, which encourages users to express opinions in exaggerated or sarcastic terms. Domenech sent his message to the timelines of his more than eighty thousand Twitter followers, not to the email inboxes of his FDRLST Media employees. And he made the tweet available to the public—a peculiar choice indeed for a threat supposedly directed at six employees. These characteristics of Domenech's tweet would give a reasonable FDRLST Media employee even more reason to read the tweet as mocking a rival internet media company or commenting on a timely socio-political issue than as threatening reprisal.

\* \* \*

We "recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Gissel Packing Co.*, 395 U.S. at 620. But in this case, the Board's failure to consider the tweet's context dooms its finding of a veritable threat. Considered in context, the tweet was not an unfair labor practice. So we will set aside the Board's order to the contrary.

V

Our conclusion is buttressed by the fact that the alleged unfair labor practice consists of the Employer's words alone. In protecting employees' statutory labor rights, neither we, nor

32

the Board, can violate an employer's right to free speech under the First Amendment. *Gissel Packing*, 395 U.S. at 617.

The Act distinguishes prohibited employer conduct from protected employer speech in Section 8(c), which provides that

> [t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter [29 U.S.C. §§ 151–169], if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c); *see Gissel Packing*, 395 U.S. at 617 ("[Section] 8(c) . . . implements the First Amendment."). Section 8(c) "manifest[s] a congressional intent to encourage free debate on issues dividing labor and management," *Chamber of Com. of the U.S. v. Brown*, 554 U.S. 60, 67 (2008) (cleaned up), and the Act favors "uninhibited, robust, and wide-open debate in labor disputes, stressing that freewheeling use of the written and spoken word . . . has been expressly fostered by Congress and approved by the [Board]." *Id.* at 68 (cleaned up). Section 8(c) reinforces the "open marketplace" created by the First Amendment, "in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." *Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298, 309 (2012).

To give effect to Congress's intent and avoid conflict with the First Amendment, we must construe the Act narrowly

33

when applied to pure speech, recognizing that only statements that constitute a true threat to an employee's exercise of her labor rights are prohibited.[9] *Cf. Graham Architectural Prods. Corp. v. NLRB*, 697 F.2d 534, 541 (3d Cir. 1983) ("What the Act proscribes is only those instances of true "interrogation" which tend to interfere with the employees' right to organize."). To interpret the Act otherwise risks expanding Section 8(a)(1)'s prohibition beyond its constitutionally permissible bounds. *See* 29 U.S.C. § 158(a)(1).

We thus must be "vigilant to see that the [Board] does not read elements of interference, restraint or coercion into speech that is in fact nonthreatening and that would not strike a reasonable person as threatening." *Windemuller*, 34 F.3d at 392. We need not determine here the precise contours of prohibited "threat[s] of reprisal or force." 29 U.S.C. § 158(c). We merely observe that the Board must be careful to distinguish "[w]hat is a threat . . . from what is constitutionally protected speech." *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam). At the very least, any finding of a

---

[9] The Supreme Court has made clear that speech restrictions based on the speaker's identity, *Citizens United v. FEC*, 558 U.S. 310, 340 (2010), the message's content, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted), or the speaker's viewpoint, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 391–92, 395–96 (1992) must be narrowly-tailored to avoid offending the First Amendment. Section 8 of the Act arguably discriminates based on all these categories, placing limits on speech by employers (but not employees) related to labor organization (but not other topics) that would interfere, restrain, or coerce (but not enable) employees' exercise of their statutory labor rights. *See* 29 U.S.C. § 158(a).

prohibited threat must be made by examining the employer's statement in its full context, with due consideration of the audience and accompanying circumstances. *Cf. id.* at 707–08 (relying on the "context, . . . expressly conditional nature of the statement and the reaction of the listeners," who laughed, in concluding the petitioner's statement was "political hyperbole" and not a criminally prohibited threat). The Board's acontextual analysis of Domenech's tweet falls far short of this standard.

\* \* \*

The National Labor Relations Act grants the National Labor Relations Board vast authority to investigate charges of unfair labor practices, even when charges are filed by parties who are not personally aggrieved by the alleged practice. But the Board's authority to find an unfair labor practice is not unlimited. Here, the Board spent its resources investigating an online media company with seven employees because of a facetious and sarcastic tweet by the company's executive officer. Because the Board lost the forest for the trees by failing to consider the tweet in context, it misconstrued a facetious remark as a true threat. We will accordingly grant FDRLST Media's petition, set aside the Board's order, and deny the Board's petition for enforcement.

MATEY, *Circuit Judge*, concurring in the judgment.

I agree with the majority's thoughtful analysis of the threats to dialogue and debate, not to mention farce, in the National Labor Relations Board's decision. In its haste to join the tedious chorus of disapproval against whatever disfavored view has most recently appeared somewhere on the internet, the Board shelved serious supervision of the protections for America's employees. Rightly, the majority concludes the Board's efforts to restrict speech cannot be squared with what "the Founders recognized [as] an inalienable natural right to express one's thoughts, sometimes described as the 'freedom of opinion.'" Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 267 (2017).

But I see an earlier problem with the Board's action. As best understood, the National Labor Relations Act cabins charging authority to those who suffered some adverse effect in the workplace. Not, as here, someone who took offense to something seen while scrolling Twitter. As the filer was not aggrieved under the NLRA, the Board lacked jurisdiction to launch this case. And because neither precedent nor deference alters the best reading of the NLRA, I respectfully concur only in the judgment.

**I.**

Understanding the scope of the NLRA requires that we "proceed[] methodically" through the statute's wording. *Badgerow v. Walters*, 142 S. Ct. 1310, 1317 (2022). The goal, as always, is to find the text's "ordinary meaning . . . at the time Congress enacted the statute," *Perrin v. United States*, 444 U.S. 37, 42 (1979), as that is a "fundamental canon of statutory construction," *Wis. Cent. Ltd. v. United States*, 138 S.

1

Ct. 2067, 2074 (2018) (quoting *id.*). Far from an open-ended examination, we "begin and end our inquiry with the text," *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017), interpreting the language using all "the standard tools of interpretation," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019), to read the words "in their context and with a view to their place in the overall statutory scheme," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019) (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)). And where "one interpretation far better accounts for . . . [t]he best reading" of the text, we adopt that meaning. *See Duncan v. Muzyn*, 885 F.3d 422, 425–26 (6th Cir. 2018). Following those principles, I read the current Section 160(b) to require an aggrieved charging party. While courts held that a *prior* version did not, Congress changed the language, meaning we cannot rely on cases interpreting the now obsolete provision. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 381 (2004) ("An amendment to an existing statute is no less an 'Act of Congress' than a new, stand-alone statute.").

## A.     The NLRA

As first passed in 1935, Section 160(b) stated that "[w]henever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board . . . shall have power to issue and cause to be served upon such person a complaint." NLRA, Pub. L. No. 74-198, ch. 372, § 10(b), 49 Stat. 449, 453 (1935) (codified as amended at 29 U.S.C. § 160(b)). Then Congress amended Section 160(b) in 1947 to add a qualifier:

> Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, *unless the person aggrieved thereby* was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge.

29 U.S.C. § 160(b) (emphasis added).[1] The NLRB, and the majority, contend the new words "person aggrieved thereby" make no difference, and that now, as then, anyone can file a charge. Traditional tools of statutory interpretation show otherwise.

**1.**

Start with the area of agreement. The first clause of Section 160(b) is broadly phrased, and the natural interpretation is that anyone, aggrieved or not, can file a

---

[1] The amendments arrived in the Labor Management Relations Act, better known as the Taft-Hartley Act, "the most complex, extensive and detailed national legislation on the subject of labor relations in the history of the country." Willett H. Parr, Jr., *The Taft-Hartley Law*, 23 Indiana Law J. 12, 12 (1947). Given the law's scope, it was unclear "what the interpretations of the Act will be in many of its departures from the [NLRA]." *Id.* Section 160(b), of course, is one of those departures.

3

charge. But we do not read clauses in the same sentence in a vacuum. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (Thompson/West 2012). Rather, we must read them together and in context. Two possibilities about the language added in 1947 emerge.

First, as argued by the NLRB, the qualifier could mean that anyone can file a charge alleging an unfair labor practice, but the Board can only respond if the alleged act occurred no more than six months before the filing. Unless, the Board adds, the filer is aggrieved and in the military, in which case they get six months after discharge. Second, as argued by FDRLST, the statute gives all aggrieved persons six months to file a charge and extends that limitation for servicemembers by starting the clock at their discharge. Both, perhaps, are reasonable. But ours is not to balance these competing claims, only to determine the best ordinary meaning of all parts of the statute.

FDRLST offers the best reading because the statute, read as a whole, contemplates a class of people who may file a charge—those "aggrieved"—and then gives a carveout for a particular subset of the aggrieved, those prevented from filing "by reason of service in the armed forces." The text refers to "*the* person aggrieved thereby." So who is "the" person? They cannot be the charged party (as the charged party is not aggrieved). Instead, they must be the charging party. *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("Congress's use of the definite article . . . 'indicat[es] that a following noun . . . is definite or has been previously specified by context.'" (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005))). And the Distributive Phrasing Canon tells us that the words "thereby" and "such" link "the person aggrieved" back to "unfair labor practice." *See* Scalia & Garner, *supra*, at

4

214 ("Distributive phrasing applies each expression to its appropriate referent."). "Whenever it is charged" that a person has engaged in "any *such* unfair labor practice," then the Board may issue a complaint, when "the person aggrieved *thereby* . . . file[s] *such* charge." The words "such" and "thereby" point back to "unfair labor practice." Therefore, "the person aggrieved" by the "unfair labor practice" must be the same person that "file[s] such charge."

The NLRB responds that using the phrase "person aggrieved" instead of "charging party" avoids endless uncertainty, as "the amendment would have exposed employers and unions to charges for an indefinite period from anyone leaving the armed forces." (Response Br. at 41.) Not so. If Congress wanted to let anyone file a charge and give aggrieved servicemen six months from the date of discharge, it could have spoken clearly: "unless an aggrieved charging party was prevented from filing such charge by reason of service in the armed forces." Ours, of course, is not to rewrite the statute or suggest more artful alternatives. But neither can the NLRB ignore the natural reading of Section 160(b) by claiming Congress had to draft the language as it did.

### 2.

More evidence arrives in Section 160(l), stating that "no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable." 29 U.S.C. § 160(l). Again, Congress chose a definite article, "*the* charging party," not an indefinite article that "implies that the thing referred to is nonspecific." *Indefinite Article*, New Oxford American Dictionary (3d ed. 2010) (quoted in *United States v. Johnman*,

5

948 F.3d 612, 618 (3d Cir. 2020)). So who is the charging party given protection from substantial and irreparable injury? The natural, logical answer is one aggrieved by the charged unfair labor practice. The interpretation urged by the NLRB means Section 160(l) would illogically forbid district courts from issuing an order to protect aggrieved, non-charging parties. A reading that, while possible, cannot be considered best.[2]

**3.**

Some final tools in our box round out the best reading: the Presumption of Consistent Usage and the Whole-Text Canon. *See* Scalia & Garner, *supra*, at 172 ("The presumption of consistent usage applies also when different sections of an act or code are at issue."). Section 160(f) of the NLRA also

---

[2] Take this case for example. Assume, as the NLRB argues, that the charging party need not be aggrieved by the unfair practice alleged. But then assume a slightly different charge (and, for all reading, this is intentional satire): that FDRLST threatened its employees with involuntary servitude and cooked up plans (posted on the internet) to roll out the diabolical scheme immediately. Too bad, says the NLRB's reading. Because the charging party is not threatened with any harm, let alone irreparable injury, Section 160(l) offers no aid to the now indentured FDRLST employees. Such results are avoided by reading "the charging party" to be aggrieved, and so eligible for injunctive relief, under Section 160(l). And because we read statutes in harmony, that reading provides more evidence that Congress contemplated only those aggrieved could file a charge under Section 160(b).

contains the term "person aggrieved,"[3] and we have interpreted that phrase to mean that the person "must suffer 'an adverse effect in fact,' to be 'aggrieved' under the NLRA." *Quick v. NLRB*, 245 F.3d 231, 251–52 (3d Cir. 2001) (quoting *Retail Clerks Union 1059 v. NLRB*, 348 F.2d 369, 370 (D.C. Cir. 1965). Consistent Usage helps show that "aggrieved" does more in Section 160(b) than merely clarify a charging party from a charged party; it puts a requirement on all charging parties. While the sections of the NLRA refer to different events (filing a charge versus receiving an adverse ruling from the Board), that is often true of different sections of an act or code. The Presumption still applies in favor of reading the statute to require an "adverse effect in fact."

Consider another consequence of the NLRB's reading. All agree Section 160(b) serves a gatekeeping function, because the NLRB can only investigate charges, and cannot launch an investigation on its own.[4] Reading Section 160(b) to allow any person to file a charge, and thus trigger the Board's otherwise dormant authority, retires the keeper from gate-watching duty. Indeed, if anyone, anywhere can file a charge about anything, why require a charge to be filed at all? The Board's reading comes close to rendering some of the text

---

[3] 29 U.S.C. § 160(f) says: "Any person aggrieved by a final order of the Board . . . may obtain a review of such order."

[4] A point that seems to distinguish the majority's comparison of a charging party to a witness to a crime. True, any person can report a crime whether or not they are a victim. But ordinarily such a report is not *needed* to trigger law enforcement's investigative authority. The NLRB does need that prompt, so the meaning of the charging requirement is necessarily part of the statute's best meaning.

7

inoperative, a direction courts should avoid where possible. *See* Scalia & Garner, *supra*, at 174 (The Surplusage Canon). Interpreting Section 160(b) to reach only aggrieved persons keeps the gates intact, consistent with Congress's plan for the 1947 amendments to "prescribe the legitimate rights of both employees and employers" to facilitate "orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other." 29 U.S.C. § 141(b).

**B.     The Proper Place for Caselaw**

The NLRB, and the majority, heavily weigh prior judicial interpretations of Section 160(b). Ordinarily, that is the proper course. But here caselaw avoids, rather than answers, the interpretive question presented: what is the best meaning of Section 160(b) following the 1947 amendments? As that question has not been addressed, we should follow the language of Congress, not the courts.

**1.**

The NLRB stakes its claim on a single Supreme Court decision suggesting that a charging party under Section 160(b) can be a "stranger to the labor contract." *NLRB v. Indiana & Michigan Elec. Co.*, 318 U.S. 9, 17–18 (1943). That it does. But *Indiana* does not apply here. *Indiana* considered whether evidence of illegal conduct might disqualify a local union from making an unfair labor practice charge against a Company. *Id.* at 17. The Court determined that the NLRA "requires a charge before the Board may issue a complaint, but omits any requirement that the charge be filed by a labor organization or an employee." *Id.* That reading was informed by portions of legislative history. *See id.* ("Senator Wagner, sponsor of the

8

Bill, strongly objected to a limitation on the classes of persons who could lodge complaints with the Board."). But more importantly, *Indiana* interpreted the 1943 version of Section 160(b) lacking the "person aggrieved" language. Nearly eight decades later, the Court has not had occasion to revisit *Indiana* and Congress's amendments.

### 2.

But our Circuit has, and the Board says those cases must control. That is not correct because those decisions simply apply *Indiana* without noting, let alone discussing, the changes to Section 160(b). Take *NLRB v. Television & Radio Broadcast Studio Employees, Local 804*, 315 F.2d 398, 400–01 (3d Cir. 1963), where a union argued that only an employee could file a charge with the Board. We explained the union did not "seriously press" that point, and that, in any event, the argument was foreclosed by *Indiana*. *Id.* at 401. That is hardly sufficient to control this decision. So too with our decision in *NLRB v. Local No. 42, International Association of Heat & Frost Insulators & Asbestos Workers*, 469 F.2d 163, 165 (3d Cir. 1972) (per curiam). There, the union argued that only an aggrieved party could file a charge. In a single sentence, we simply cited *Television & Radio Broadcast Studio Employees, Local 804*, without more, as binding. *Id.*

*Indiana* cannot carry that much weight this far into the future. And our prior cases simply cite *Indiana*.[5] Applying

---

[5] As do the other decisions cited by the Board. None undertake a textual analysis of Section 160(b), usually because the charging parties are also aggrieved parties. The Second

9

those decisions to the amendments passed in 1947 necessarily extends, rather than follows, precedent. And when faced with the choice of broadening decisions that fight, not follow, the best reading of the text, our obligation is clear. *See Williams v. Taylor Seidenbach, Inc*., 958 F.3d 341, 350 (5th Cir. 2020) (en banc) (Ho, J., concurring) (judges should follow legal texts "to the maximum extent that Supreme Court precedent permits"); *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 543 (6th Cir. 2021) (en banc) (Bush, J., concurring) (same); *Edmo v. Corizon, Inc*., 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc) (same); *see also*

---

Circuit's decision in *Elec. Contractors, Inc. v. NLRB*, 245 F.3d 109 (2d Cir. 2001) is a good example. There, the charging party was a union alleging that a vendor tried to prevent its employees from joining. The vendor argued the Board lacked jurisdiction because the charging party was a labor organization. Relying solely on *Indiana*, the court disagreed. *Id*. at 121. But, of course, the union might have been an aggrieved, interested party. The cases cited by the Board, and the majority, all follow that theme: interested parties filing unfair labor practice charges, and courts offering passing reference to either *Indiana*, the Board's any-person regulation, or both. *NLRB v. Chauffeurs, Teamsters & Helpers, Loc. No. 364*, 274 F.2d 19, 24–25 (7th Cir. 1960) (citing *Indiana* to reject the argument that a party "engaged in the labor dispute" could not file a charge); *S. Furniture Mfg. Co. v. NLRB*, 194 F.2d 59, 60–61 (5th Cir. 1952) (citing *Indiana* to reject the argument that one aggrieved party may not file a charge on behalf of a class of aggrieved parties); *NLRB v. Gen. Shoe Corp*., 192 F.2d 504, 505 (6th Cir. 1951) (citing *Indiana* to reject the argument that a labor union must have a member employed by the charged party to file a charge).

*United States v. Johnson*, 921 F.3d 991, 1010 (11th Cir. 2019) (en banc) (Jordan, J., dissenting) (when it comes to precedent with a "shaky originalist foundation . . . there is always the option of declining to broaden it—of refusing to extend it one inch beyond its previous contours" (cleaned up)).[6]

Despite the Board's insistence that this is well-settled law, no court has held what we hold today: that even under the post-1947 NLRA, a stranger may file a charge with the NLRB, despite Section 160(b)'s "person aggrieved" language. That leaves little work for the "aggrieved party" limitation to do. A limitation that, once read out of the statute, gives the Board near plenary jurisdiction to roam unfettered around the nation investigating the perceived threats to labor posed by a tweet here, a post there, a comment somewhere. Respectfully, that is not the best reading of the statute.

**II.**

Finally, the Board turns to deference, urging us to put aside the statute because it has "consistently reaffirmed" *Indiana* in its regulations. (Response Br. at 36–37.) But just as the Board cannot transform day into night, it cannot import *Indiana*'s pre-1947 statutory analysis into the post-1947 NLRA. A point made clear by the Supreme Court's repeated

---

[6] The Board's attempt to rely on the legislative history referenced in *Indiana* as evidence of "Congress's choice to allow any person to file charges" is unavailing. (Response Br. at 39.) As explained, *Indiana* interpreted a different statute. And, of course, "[w]e are governed by laws, not by the intentions of legislators." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring).

11

instructions on the limited deference given to agency statutory interpretations. Under the familiar framework of *Chevron*, a court must first determine whether the statute is "ambiguous." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). A phrase that, while once shrouded in mystery,[7] is now understood to turn not on possible meanings, but ordinary understanding. *See Kisor*, 139 S. Ct. at 2415 (courts must "empty" the "legal toolkit"); *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) ("First, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue." (quotations omitted)). Finding ambiguity where none exists is, as *Chevron* itself states, contrary to the judicial duty to act as "the final authority on issues of statutory construction." 467 U.S. at 843 n.9; *see also Gun Owners of America, Inc. v. Garland*, 19 F.4th 890, 926 (6th Cir. 2021) (en banc) (Murphy, J., dissenting) ("A finding of ambiguity can occur only at the end of our usual interpretative process . . . . [A] court must give the relevant words their ordinary meaning."); *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019) ("*Chevron* deference must be reflective, not reflexive."); *Arangure v. Whitaker*, 911 F.3d 333, 338 (6th Cir. 2018); *Voices for Int'l Bus. & Educ., Inc. v. NLRB*, 905 F.3d 770, 780–81 (5th Cir. 2018) (Ho, J., concurring) ("Finding ambiguity where it does not exist . . . misuse[s]

---

[7] *See* Brett Kavanaugh, *Two Challenges for the Judge as Umpire: Statutory Ambiguity and Constitutional Exceptions*, 92 Notre Dame L. Rev. 1907, 1912–13 (2017) ("[J]udges should strive to find the best reading of the statute, based on the words, context, and appropriate semantic canons of construction" to avoid a "culture of ambiguity [instead of] a culture of law.").

. . . *Chevron*.").[8] In short, deference arises in the rare case when no superior statutory reading can be found, not when an inferior construction competes with a best reading.

And as explained, the best reading of the NLRA grants charging power only to those aggrieved. With our tools unpacked, the NLRB's plea for deference is unwarranted.

---

[8] FDRLST notes that *Chevron* deference is constitutionally suspect, a practice that requires courts to "bow to the nation's most powerful litigant, the government, for no reason other than that it is the government." *Egan v. Delaware River Port Auth.*, 851 F.3d 263, 278 (3d Cir. 2017) (Jordan, J., concurring). That suspicion is decreased with a searching application of the statutory text, after which a "court will almost always reach a conclusion about the best interpretation," leaving "no need to adopt or defer to an agency's contrary interpretation." *Kisor*, 129 S. Ct. at 2448 (Kavanaugh, J., concurring). "In other words," the interpretation requirement of *Chevron*, "taken seriously, means that courts will have no reason or basis to put a thumb on the scale in favor of an agency." *Id.*; *see also Pauley v. BethEnergy Mines, Inc*., 501 U.S. 680, 707 (1991) (Scalia, J., dissenting) ("*Chevron* is a recognition that the ambiguities in statutes are to be resolved by the agencies charged with implementing them, not a declaration that, when statutory construction becomes difficult, we will throw up our hands and let regulatory agencies do it for us.").

## III.

If we needed to reach whether Domenech's words constituted an unfair labor practice, the majority's reasoned holding is correct. But we need not, because the best reading of the NLRA trims the NLRB's jurisdiction and prevents unaffiliated parties from searching the internet for wisecracks to transform into workplace violations that unleash the NLRB's sweeping power. Precedent does not require today's jurisdictional holding, and the NLRA's text marshals against it. For those reasons, I respectfully concur only in the judgment.

14